**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-352-JEB** |
| **MARC BRU,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Marc Bru to 87 months of imprisonment followed by three years of supervised release, a fine of $7,946, $2,000 in restitution, and the mandatory special assessment of $280. The government's recommended sentence is at the top of Bru's applicable Sentencing Guidelines range, which the U.S. Probation Office calculated as 70–87 months.

## I.   INTRODUCTION

Defendant Marc Bru—a 44-year-old unemployed Washington State resident and member of the Proud Boys—participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

Leading up to January 6, 2021, Bru knew that Congress planned to convene a joint session on January 6 to certify the Electoral College ballots and officially make Joseph Biden the President-Elect. In Bru's view, if Biden succeeded in taking office, the country would be overtaken by evil "globalist," communist elites, which Bru refers to interchangeably and collectively as the "corporation," "totalitarian regime," "de facto regime," and "banking cartel." Given the perceived threat, Bru was committed to stopping the certification, no matter the cost.

On the morning of January 6, Bru gathered with other Proud Boys on the National Mall. Intent on obstructing the certification, Bru, along with the group of Proud Boys, did not attend the former president's "Stop the Steal" rally and instead marched to the grounds of the U.S. Capitol. Bru was among the first to breach the restricted perimeter on the west side of the Capitol, where he spent nearly two hours verbally and physically confronting overwhelmed and outnumbered police officers. At one point, Bru rushed in to join a struggle between rioters and police officers. Bru used his full body weight to push back against a bike rack barricade that police officers were attempting to use to re-establish control of a small area on the West Plaza. The officers tried to repel Bru with pepper spray, but he was wearing goggles and avoided it by ducking; Bru only retreated when an officer tried to punch him. Eventually the police line broke in other locations

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

and Bru took advantage. He entered the Capitol building and made a beeline for the Senate Gallery, which the Vice President and senators had evacuated just twenty minutes earlier. Standing in the Senate Gallery, Bru posed for commemorative and celebratory selfies overlooking the evacuated Senate Floor. Soon after, Bru exited the Capitol building, having spent approximately thirteen minutes inside.

Within six weeks following the riot, Bru sought to buy gas masks in bulk, recruited others, and made plans to lead a violent, armed insurrection to take over the government in Portland, Oregon. Bru was arrested in this case before those plans could come to fruition.

Bru committed two new crimes while on pretrial release. In February 2023, he was arrested in Idaho and charged with Driving Under the Influence (DUI), among other crimes. Three months later, in May 2023, while on pretrial release in both this case and the Idaho DUI case, Bru reoffended in Montana and was charged with DUI (2nd offense). He then failed to appear for court hearings in either the Idaho or Montana cases, leading to bench warrants.

Shortly before Bru's July 17, 2023 trial date in this case, Bru absconded and defiantly boasted via Twitter that the government would have to come get him if it wanted him. Approximately a month later, it did.

Following Bru's re-arrest, he opted for a bench trial and elected to represent himself *pro se*. Once trial began, Bru repeatedly announced that he refused to "consent" to the proceeding, declined to put on a defense, and showed nothing but contempt for the Court and the government. The Court swiftly found Bru guilty on all seven counts. Specifically, the Court found that Bru violated: 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds);

18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(B) (Entering and Remaining in the Gallery of Congress); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds); 40 U.S.G. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building); 18 U.S.C. § 231(a)(3) (Civil Disorder); and 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding).

The government's recommended sentence of 87 months' incarceration—the high end of the advisory Sentencing Guidelines range—reflects the gravity of Bru's conduct on January 6, 2021, his attempt to organize an even more violent riot in Portland, his commission of new crimes while on pretrial release, his obstructive conduct while on pretrial release, his utter lack of remorse, and the danger that Bru continues to pose to the community today.

## II.   FACTUAL BACKGROUND

### *The January 6, 2021 Attack on the Capitol*

The Court is well aware of the general background of the January 6, 2021 attack on the Capitol, so the government will refrain from repeating that background here. *See* ECF No. 1-1.

### *Defendant Bru's Role in the January 6, 2021 Attack on the Capitol*

The November 2020 election of Joe Biden was a turning point for Bru. A few days after the election, he told a friend on Facebook:

> All hell has broke loose. . . The water mark is nana tech from Xerox, that was embedded in all the legitimate ballots. All the legitimate ballots that went to dead people, and all over to handlers have been traced. POTUS is still Trump. He's handling the fraud, it's a big joke on both parties he's going to have them all jailed or hung. **We have until Jan 20**.

Trial Ex. 811 (emphasis added).

In Bru's mind, the election results were fraudulent, and Trump supporters had until Inauguration Day to stop the usurpers and secure the country's future. He got to work educating himself on how best to do so, which led him to learn about the significance of the Electoral College certification scheduled for January 6, 2021. On December 15, 2020, Bru posted a lengthy message on Facebook, which he copied and pasted from a post by one of the former president's lawyers, that detailed the certification process and how it could be manipulated to ensure that Trump stayed in power. *See* Trial Ex. 813.

In the weeks leading up to January 6, Bru also grew increasingly frustrated with COVID-19 safety measures and restrictions in the Pacific Northwest, where he was residing at the time. In response to a friend expressing concern about physical violence at rallies against COVID-19 policies, Bru remarked that "[a]nytime Patriots are going out to exercise their rights and their freedoms nowadays in a potential for opposition. **Being timid now is not the remedy**." Trial Ex. 812 (emphasis added). In another message to a friend, Bru said that "[t]he government caused this culture that we are experiencing and therefore **we have to hit the government back** in order to change it." Trial Ex. 814 (emphasis added). Bru thus publicly embraced and promoted political violence prior to January 6, 2021.

On January 5, 2021, Bru flew from Portland, Oregon to Washington, D.C. The next morning, ready for confrontation with "Antifa" and the police, he put on clear goggles and a neck gaiter to hide his face and headed to the National Mall. There, he connected with a large contingent of other Proud Boys and took a selfie. The group did not attend the former president's nearby "Stop the Steal" rally.

5



*Image 1: Bru (outlined in yellow) selfie showing himself and other Proud Boys (Trial Ex. 806)*

Before the former president began speaking at the "Stop the Steal" rally, Bru and his fellow Proud Boys, a group estimated to be comprised of one-hundred or more individuals, marched to and around the Capitol grounds. On the way, Bru recorded a video featuring the Capitol building in the distance while he stated "I'm here at this beautiful nation's capital. Though it's foreign soil, **it won't be for long**. This country no longer belongs to the banking cartel."[2] Bru posted the video to Facebook with a caption that repeated the same message. Trial Ex. 804 (emphasis added).

---

[2] Bru's repeated references to the "banking cartel" and "corporation" appear to be related to a key sovereign citizen theory that "[a]t some point, a corporation secretly usurped the United States government, then went bankrupt and sought aid from international bankers. As collateral, the corporation offered the financiers . . . us. As sovereigns tell it, your birth certificate and Social Security card are not benign documents, but contracts that enslave you." *See How Sovereign Citizens Helped Swindle $1 Billion From the Government They Disavow*, N.Y. TIMES (Mar. 29, 2019), https://www.nytimes.com/2019/03/29/business/sovereign-citizens-financial-crime.html.

After spending time on the east side of the Capitol, Bru made his way back to the west side. At approximately 12:58 p.m., Bru joined the first wave of rioters to breach the restricted perimeter on the west side near Peace Circle. In doing so, he walked over downed metal bike-rack barricades and "Area Closed" signs in his path:



*Image 2: Open-source image showing Bru, outlined in red, walking over barricades with "Area Closed" signs visible (Trial Ex. 506)*

Bru then quickly made his way to the front of the mob on the West Plaza. There, he verbally harassed a severely outnumbered group of U.S. Capitol Police (USCP) officers. Bru pointed at them and repeatedly yelled: "you'll die for the corporation!" Trial Ex. 501.



*Image 3: Screenshot from open-source video showing Bru, circled in red, pointing and shouting at USCP officers on the West Plaza (screenshot from Trial Ex. 506)*

At approximately 1:13 p.m., Metropolitan Police Department (MPD) reinforcements arrived. With the aid of metal bike-rack barricades, the officers slowly pushed rioters away from the Capitol and formed a line behind the barricades. This regrouping seemed to enrage the rioters, Bru included. After a brief retreat into the mob, Bru weaved his way back to the front to join others in a battle over the barricades, which were the officers' primary advantage and protection. Bru grabbed hold of one barricade with both hands and pushed it into the officers, putting his entire body weight behind the effort:

8



*Image 4: Bru pushing the bike-rack barricade on the West Plaza (Trial Ex. 402)*

Verbal warnings and a close-range shot of pepper spray to the face did not deter Bru. With his goggles on and head down, Bru kept pushing the barricade with all of his strength, preventing the officers from pushing the mob further back. Out of other options, USCP Inspector Thomas Loyd—a senior officer in the USCP with over 30 years of experience, an officer whose duties do not normally involve crowd control—joined his officers on the front lines, stepped into a gap, and attempted to punch Bru. Though Inspector Loyd missed Bru, Bru nevertheless fell back into the crowd. *See* Trial Exs. 401, 502–504.

At approximately 2:28 p.m., rioters near Bru succeeded in breaking the police line on the south end of the West Plaza and surged up the steps of the Capitol to the Upper West Terrace. Bru was among them. By 2:32 p.m., he had joined a large crowd outside of the exterior Upper West Terrace doors. Though rioters had already breached the exterior doors by that point, the interior doors remained closed and guarded by four uniformed USCP officers. Bru and the other rioters near him were not deterred. Standing with an emergency exit-only sign to his left, while others chanted "let us in!" around him and alarms sounded overhead, Bru waited and recorded the unfolding chaos on his phone:



*Image 5: Bru standing inside the exterior Upper West Terrace doors (screenshot from Trial Ex. 507 at 48 sec.)*

10

At approximately 2:35 p.m., the USCP officers—knowing that they would not be able to hold back the increasingly irate mob for long—wordlessly stood aside. Bru and the other rioters then streamed inside.

In under ten minutes, Bru made his way through the Rotunda, up the Gallery Stairs, and to the Senate Gallery. While standing in the Senate Gallery, Bru took several selfies with the empty Senate Floor in the background—the floor from which, just twenty minutes prior, Secret Service agents had evacuated the Vice President and his family, and police officers had evacuated senators and their staffs. In one of the selfies, Bru flashed a hand sign associated with the Proud Boys (as seen in Image 6 below).



*Images 6 (left) and 7 (right): Bru's selfies in the Senate Gallery (Right – Tr. Exhibit 809; Left – Tr. Exhibit 810)*

11

After spending a few minutes inside the evacuated Senate Chamber, Bru journeyed over to the Ohio Clock Corridor, where he ran into a line of USCP officers engaged in a stand-off with other rioters. Bru observed the scene for a while before turning around and leaving the corridor. He then exited the Capitol through the Senate Carriage Doors. In total, Bru spent approximately thirteen minutes inside the building.

### *Defendant Bru's Conduct After January 6, 2021*

On January 8, 2021, Bru warned a friend on Facebook that the aftermath of January 6 was "going to get bumpy" and that although he would be reachable on Signal (an encrypted messaging application), he would need to delete his Facebook account. Records obtained from Facebook via search warrant confirm that two days later, on or about January 10, 2021, Bru in fact deleted his Facebook account.

In mid-February 2021, Bru exchanged a series of text messages with a friend about buying discounted gas masks in bulk. Trial Exs. 902–903. Then, on February 23, 2021, Bru sent the following text message to an apparent Proud Boys recruit:

> If we do Portland, we do it in shock and awe. **Overwhelm them shit stains with thousands of patriots like the capital.** Liberate the libtards from themswlves. Who will come against us? JBGC,[3] Cascadia, city cops, special unites like SWAT, and sheriffs? I would think we could out number all them twats. This would be like pulling the teeth out of the dogs mouth. Then deconstruct the comms transmitters and such. **Be done with them and doesn't matter what judicial legislates from the bench. They keep it up and we occupy them too.** I don't see how NGs[4] would be dispatched from dc to come put out this fire. This would be a true test if military admin was controlling anything. Better than dying a death of a thousand cuts.

Trial Ex. 904 [*sic*] (emphasis added).

---

[3] "JBGC" is an acronym for the John Brown Gun Club, "an ideologically left-leaning community

Approximately one month later, FBI agents arrested Bru in Vancouver, Washington. Evidence seized from Bru's vehicle included the neck gaiter Bru wore on January 6, 2021 (Trial Ex. 706), a Vancouver Proud Boys sweatshirt (Trial Ex. 705), and a helmet with a patch bearing the Proud Boys logo and motto: "I AM A WESTERN CHAUVINIST WHO REFUSES TO APOLOGIZE FOR CREATING THE MODERN WORLD" (Trial Ex. 704).

The Court granted Bru pretrial release with the conditions, among others, that he has not committed any new federal or state crimes and that he report any travel to Pretrial Services. Bru violated those conditions on multiple occasions. *See* PSR ¶ 11. On February 17, 2023, Bru was arrested in Idaho and charged with Driving Under the Influence (DUI) and Driving Without Privileges. *See id.* ¶ 76. The state court in Idaho allowed Bru to remain at liberty while the DUI progressed. Three months later, on May 28, 2023, while in Montana, Bru drove drunk again, as confirmed by a breath analyzing device that revealed a breath alcohol content of almost 1.5 times the legal limit. *See id.* ¶ 77. Bru was arrested and charged with DUI (2nd offense). *See id.* He then failed to appear for court hearings in both the Idaho and Montana cases, generating state court bench warrants. *See id.* ¶¶ 76-77.

## III.   THE CHARGES

On December 1, 2021, a federal grand jury returned a superseding indictment charging Bru

---

defense organization." *See* "John Brown Gun Club," Liam Coyle, The Modern Insurgent, *available at:* https://www.moderninsurgent.org/post/john-brown-gun-club (last accessed January 10, 2024); *see also* "Anti-Fascist. Armed to the Teeth," Jack Crosbie, ROLLING STONE, available at: https://www.rollingstone.com/culture/culture-features/john-brown-gun-club-armed-anti-fascist-1234733200/ (last accessed January 10, 2024).

[4]  In context, "NGs" appears to refer to the National Guard.

with seven counts: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 2); Entering and Remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B) (Count 3); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 4); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 § 5104(e)(2)(G) (Count 5); Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 231(a)(3) (Count 6); and Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count 7).

## IV.   BRU'S ABSCONSION IN THIS CASE

After several continuances, the Court scheduled trial to begin on July 17, 2023. Bru failed to appear at the June 26, 2023 pretrial conference, however. *See* Minute Order, 6/26/23. The government moved for a bench warrant, but the Court gave Bru the benefit of the doubt, denied that request, and continued the pretrial conference to July 6, 2023. *See id.*

On June 28, 2023, Bru tweeted screenshots of a conversation he had with another individual about news reports concerning his failure to appear. In that conversation, Bru wrote:

> nice, I certified mailed my motion to the prosecutor, **I'm done entertaining their bullshit. If they want me they will come get me. I'm drawing a fucking line in the sand.** I can't believe Americans are willingly paying money to see their fucking so called patriot heroes go to the totalitarian clink. They torture, they strip rights, they murder and everyone is ok with letting j6ers go through the motions to be unappreciated martyrs? Americans can go fuck themselves I've lost my life, my family, my prosperity for the cause, yet still no fucking backbone from Americans. I'm not a debt slave, **I will not submit to a totalitarian belligerent de facto regime.** Thanks for the info. You should make sure my reply makes it to print, [OK hand sign emoji] [four-leaf clover emoji]. **I'd rather die free than submit to fuckin tyrants**.

Trial Exs. 818A–818B.

After the government directed the Court's attention to Bru's tweets, *see* ECF No. 66, the Court set a status conference on June 30, 2023, *see* Minute Order 6/29/2023. Bru failed to appear at that hearing as well, so the Court issued a bench warrant for his arrest. *See* Minute Order 7/6/2023. This became Bru's third pending arrest warrant; while on pretrial release, Bru had been charged, in separate incidents, with drunk driving-related offenses in Idaho and Montana but had failed to appear for court appearances in both cases. *See infra* Section VII(B).

On July 23, 2023, in an ironic twist, a drunk driver hit Bru's car while he was secretly living in Montana. Local police officers investigating the crash and the damage to Bru's car found Bru on scene and ran his identification through police databases. Upon learning of Bru's federal warrant, those local police officers arrested Bru and transferred him to custody of the U.S. Marshals. The Court detained Bru until his October 2, 2023 bench trial date. *See* Minute Entry 8/3/2023.

## V.    TRIAL

In the lead-up to trial, Bru, representing himself *pro se*, filed a nonsensical document styled as "Judicial Contract for Prosecution Powers by and between Marc Anthony Bru and Michael Gordon," the lead prosecutor. ECF No. 71. The document began with the following "Legal Notice to Michael Gordon":

> this contract must be signed, dated and notarized to proceed the case No. 21-cr-352, otherwise Michael Gordon is forcing an association in violation of peremptory norms establishing an international crime.
>
> [. . .]
>
> Michael Gordon acknowledges and accepts that the US is a private membership

> association, styled the United States Corporation Company, and its private charter,
> the United States Constitution, is a foreign entity that Marc Anthony Bru is not a
> member of . . . so the only agreement Marc Anthony Bru is willing to make is to
> never enter the Washington District of Columbia ever again or associate with any
> of its parties again.

*Id.* Bru filed a similarly nonsensical "Judicial Contract" that purported to inform his stand-by counsel that he was merely a "translator" for Bru during the trial and would face "war crimes" if he signed any document that subjected Bru to "prison time, jail time, or any debt." *Id.* Despite Bru's demands, neither the government nor his stand-by counsel signed either "contract."

Bru also made several attempts to further delay the trial date, claiming he needed additional time to prepare and review discovery two-and-a-half years after his arrest and nearly three months after his original trial date. *See, e.g.*, ECF No. 75. The Court granted Bru one extra day to prepare, resetting the trial for October 3, 2023. *See* Minute Order 9/29/2023.

Despite the almost six months that elapsed between Bru's first trial date, *see* Minute Order 10/14/2022 (setting trial to begin on April 17, 2023), and the assistance of able stand-by counsel, Bru did not present a case and attempted to make a mockery of the entire proceeding. Instead of presenting an opening statement, Bru filed a meaningless document he titled "Negative Averment." ECF No. 84. He also told the Court that he did not "consent" to trial, that the trial was "political and illegitimate and not lawful," and that for the previous "three years, [he] had denied contract between [him] and the government or perceived government," which he suggested invalidated the entire proceeding. Trial Tr. at 5, 12. Each time the Court asked Bru if he wished to cross-examine a government witness, Bru reiterated that he did not "consent" to trial. Trial Tr. at 65, 80, 143. When asked if he wished to give a closing, Bru stated:

> Well, though I am not in contract and I don't consent to this, I would like to just

16

point out that the representative for the belligerent de facto has already stated for the record that you are a corporation. And you can look at it in public record on the Dun & Bradstreet public record. It's a for-profit corporation. And a corporation cannot have authority over the people because the people are public.

Trial Tr. at 164–65.

The Court convicted Bru on all seven charges. In explaining its verdict, the Court highlighted that while the vast majority of January 6 defendants attended former President Trump's speech at the "Stop the Steal rally," Bru "did not attend the speech, didn't go to Washington to attend the speech, but rather, went to meet up with other Proud Boys and planned, as he said in earlier posts, to go to the Capitol. That was the intent all along." *Id.* at 166:7–11. Bru "was there to help others overthrow the valid election." *Id.* at 166:17–18. The Court noted that Bru's plastic googles "showed that he was ready to go and prepared for pepper spray and confrontation," and the Court characterized Bru as "a chief antagonist in the crowd" resisting police efforts to control the mob on the West Plaza. *Id.* at 167:10–11. The Court also stressed that Bru exhibited "no remorse," *id.* at 167:20, had exhibited a "lack of respect for this Court" throughout the process, *id.* at 172:9, and represented "a danger to the community," *id.* at 172:12.

## VI.    BRU'S POST-TRIAL STATEMENTS

Since his conviction, Bru has continued to spew disinformation from the confines of the D.C. Jail. If anything, he appears to be growing more defiant and radicalized. He continues to show no remorse whatsoever and has attempted to profit from his January 6 crimes by casting himself as a patriot and persecuted victim as he appeals for donations to his GiveSendGo fundraising page,

which bears the title "Marc Anthony Bru J6 Political Prisoner of War."[5]

For example, on October 15, 2023, Bru called into the "Freedom Corner," a nightly vigil held by January 6 sympathizers in honor of January 6 defendants.[6] During his call, Bru discussed his plan to send a "complaint" to a U.S. senator regarding federal agent and Antifa provocateurs being to blame for the "inside job" that was January 6. The "complaint," Bru explained, would be against this Court and the undersigned lead prosecutor.[7] Bru then proceeded to go on lengthy tangents, stating that this Court is an illegal kangaroo court that lacks jurisdiction to try him; that his trial was fake and constituted an international war crime; and that the government is committing a "racketeering job on the American public" by charging January 6 defendants. Casting himself as a victim based on his status as a January 6 defendant, Bru advertised his GiveSendGo account and assured listeners that the funds would not be used on the "bottomless pits that are lawyers."

Following this call, the news commentary website "The Gateway Pundit" published an article featuring Bru's January 6 case.[8] The article included a letter that Bru submitted to the website. In the letter, Bru blamed USCP and MPD officers, FBI agents, and "suspicious actors"

---

[5] "Marc Anthony Bru J6 Political Prisoner of War, GiveSendGo, available at: https://www.givesendgo.com/J6_Politically_Persecuted (last accessed January 16, 2024).

[6] *Marc Bru Political Prisoner at the DC Gulag 10/15/23*, YOUTUBE (Oct. 15, 2023), https://www.youtube.com/watch?app=desktop&v=SrxUBwP3QKs&edufilter=NULL.

[7] The undersigned has not received and has no additional information about any such complaint.

[8] *Proud Boys Member Marc Bru Was Arrested by Federal Agents at Gunpoint with His Mother – He Was Found Guilty of "Obstruction of Official Proceeding" for Attending a Protest – While Democrat Jamaal Bowman Walks Free **Please Help J6er Marc Below**** (re-published on Jan. 2, 2024), available at: https://www.thegatewaypundit.com/2024/01/proud-boys-member-marc-bru-was-arrested-federal/#comments.

like Ray Epps, who was recently sentenced by this Court, *see* 1:23-cr-321-JEB, for "starting the riot." He warned readers against accepting "kangaroo trials, where the accused is robbed of due process and denied basic elements of defense." And he asked readers who "can't directly join in the fight for freedom in American, and all around our world" to "recognize people who can and do," *i.e.*, those like him "who are taking a stand, however they can." The article contained a link for readers to donate to Bru's GiveSendGo page.

On October 30, 2023, Bru called into "Freedom Corner" again. This time, he focused more on his actions on January 6.[9] He explained that on that day, there was "an obvious usurp of power that was going on and knowing our duty as Americans we had an absolute duty to stop the steal and interrupt" the Electoral College certification. As an aside, he said that he looked up the definition of "filibuster," which he said was "to obstruct." Bru argued that if Congressmembers regularly obstruct each other via the filibuster, his own obstruction of the certification could not possibly be "that big of a deal."

Bru added that what happened on January 6 could not have disrupted "the peaceful transfer of power" because the transfer could never be peaceful given that it was "fraudulent." Bru also posited that he and other defendants are being made examples of by the government for merely exercising their freedoms. Finally, Bru quoted Vladimir Putin and argued that the country would need to start from scratch if we are to become a "legitimate" nation again. He ended the call by advertising the Gateway Pundit article featuring his story and promoting his GiveSendGo

---

[9] *Marc Bru Political Prisoner in the DC Gulag 10/30/23*, YOUTUBE (Oct. 30, 2023), available at https://www.youtube.com/watch?v=HPE8uKFcpW8.

fundraising campaign.

On or about December 18, 2023, Bru called into the "Freedom Corner" a third time. He accused D.C. judges of being "bank tellers and human traffickers" who have "kidnapped" January 6 defendants, "holding them hostage at the D.C. jail." He further stated that he and the other January 6 defendants "are hostages, Trump said it. And we fit every definition. [Trump] wasn't making a political statement by calling them hostages, he was making a lawful statement… enough with the politics, we need to get out of here! . . . People have to claw back the power. And they have every right to. Every man and woman has a right to a nation. . . they've declared war against the public."

On January 9, 2024, Bru—or someone on his behalf—posted an update to his GiveSendGo fundraising page titled "Update #1 Washington Post Refused to Post Ad." The update states:

> I, Marc Anthony Bru, incarcerated, have been manipulated and coerced via forced association to be held collateral as a mortgage backed security for an investment in the courts registry investment system. The trustee who was entrusted with the fiduciary obligations on the case moved forward in dereliction of enforcing human rights, violation of peremptory norms, malfeasance of office, and dishonesty . . .

"Marc Anthony Bru J6 Political Prisoner of War, GiveSendGo, available at: https://www.givesendgo.com/J6_Politically_Persecuted (last accessed January 16, 2024). The post does not clarify whether the "trustee" Bru accuses refers to this Court, the undersigned lead prosecutor, or someone else.

On January 15, 2024, Bru called into the "Freedom Corner" a fourth time.[10] During this call, he informed his listeners that he would be "mak[ing] a special appearance at the court" on

---

[10] *J6 Vigil on MLKJr Day 01/15/*2024, YOUTUBE (January 15, 2024), available at https://www.youtube.com/watch?v=ginCRtyyRlU.

January 24, 2024 to "reinforce" a soon-to-be-filed motion that will hold this Court and the government accountable for convicting and incarcerating him. He also accused the Court and the government of propping up an "industrial level of human trafficking" and financially benefiting from his incarceration. He further accused the government of withholding unidentified exculpatory evidence and improperly inserting Congress as victim in this case, thereby "mocking the rule of law."

## VII.   STATUTORY PENALTIES

Bru now faces sentencing on each of the counts listed above. The maximum terms of incarceration for each count are detailed in the chart below.

| Count | Statute | Maximum Term of Imprisonment |
|:---:|:---:|:---:|
| 1 | 18 U.S.C. § 1752(a)(1) | 1 year |
| 2 | 18 U.S.C. § 1752(a)(2) | 1 year |
| 3 | 40 U.S.C. § 5104(e)(2)(B) | 6 months |
| 4 | 40 U.S.C. § 5104(e)(2)(D) | 6 months |
| 5 | 40 U.S.C. § 5104(e)(2)(G) | 6 months |
| 6 | 18 U.S.C. § 231(a)(3) | 5 years |
| 7 | 18 U.S.C. § 1512(c)(2) | 20 years |

For the Class A misdemeanors—*i.e.,* Counts 1 and 2—Bru also faces a maximum of one year of supervised release, a fine of up to $100,000, and a mandatory special assessment of $25 per count. For the Class B misdemeanors—*i.e.,* Counts 3, 4, and 5—Bru also faces a fine of up to $5,000, and a mandatory special assessment of $10. And for the felony counts—*i.e.,* Counts 6 and 7—Bru faces a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100 per count.

## VIII.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).[11]

The government agrees with the PSR's ultimate Sentencing Guidelines range calculation, which is 70–87 months. However, the PSR made one error in arriving at its final calculation: it did not include a Guidelines analysis for all counts to which the Guidelines apply.[12] Although the

---

[11] The government recognizes that, in a previous case that similarly involved a conviction under 18 U.S.C. § 1512(c)(2) as well as other charges, this Court declined to definitively calculate the advisory Guidelines range for the § 1512(c)(2) conviction in light of the Supreme Court's grant of certiorari in *United States v. Fischer*, No. 23-5572. *See United States v. Carpenter*, No. 21-cr-305 (JEB), Sent. Hrg. Tr. at 25–28. This Court reasoned that the sentence imposed would have been the same notwithstanding the § 1512(c)(2) conviction. Id. at 3, 26. At the same time, a sentencing court is required to calculate the advisory Guidelines range on all counts of conviction. *See Peugh v. United States*, 569 U.S. 530, 537 (2013) ("Failure to calculate the correct Guidelines range constitutes procedural error."). Further, given the seriousness of Bru's conduct underlying the § 1512(c)(2) conviction, it is appropriate to sentence him within the Guidelines range resulting from all counts. *See United States v. Fonticoba*, No. 21-cr-638, Sent. Hrg. Tr. at 66–67 (TJK) (noting that even without the § 1512(c)(2) conviction, the court would vary upward to impose the same sentence because the "intent to obstruct the proceeding and the nature of the proceeding itself is so important and so critical in terms of deterrence and all the rest and in terms of the specific fact pattern here that that would be my sentence").

[12] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (see PSR ¶ 38) that Counts One and Four group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

omissions do not impact the final Guidelines calculation, the government has included the Guidelines calculations for each count in Exhibit 1 for completeness and the Court's convenience.

The U.S. Probation Office ("Probation") calculated Bru's criminal history as a category I. PSR ¶ 71. Accordingly, Probation calculated Bru's total adjusted offense level at 27 and his corresponding Guidelines range at 70 months to 87 months. PSR ¶¶ 68, 102.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The PSR does not apply § 4C1.1 here, and Bru has not argued for its application. That is for an obvious reason: Bru violently pushed a metal bike rack barricade into a line of officers on the West Plaza, putting his entire body weight into the effort. Under a totality of the circumstances, Bru thus engaged in the personal use of violence or credible threats of violence against people or property, which disqualifies him from receiving the reduction contained in § 4C1.1. The government is aware of at least three cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence: *United States v. Gundersen*, 21-cr-137 (RC), *United States v. Baquero*, 21-cr-702 (JEB), and *United States v. Dillard*, 23-cr-49 (JMC).

The Court should not apply § 4C1.1 here for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or

personally threatened violence, contributed to this harm.

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments that motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

## IX.    BRU'S OBJECTIONS TO THE PSR

Bru makes two overlapping objections to the PSR with respect to its calculations for Count Seven: obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). Those calculations, which the government agrees with, are reproduced below in an abbreviated manner for convenience:

Count Seven: 18 U.S.C. § 1512(c)(2):

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(1)(B) | Injury/threatened injury to obstruct | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial interference | +3 |
| U.S.S.G. § 3C1.1 | Obstruction of justice | +2 |
| | **Total:** | **27** |

PSR ¶¶ 58–65.

Bru first contends that the PSR erred in applying the three-level enhancement under U.S.S.G. § 2J1.2(b)(2) and the eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B). Second, Bru argues that the PSR erred as a factual matter by applying the eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B) because he neither threatened nor caused physical injury or property damage. The government addresses each objection in turn.

### 1. Legal Application of U.S.S.G. § 2J1.2(b)(2) and 2J1.2(b)(1)(B)

Bru argues that neither enhancement applies because "electoral certification does not involve the 'administration of justice' as contemplated by the Guidelines." ECF No. 89 at 1. Bru is mistaken. Congress's Joint Session on January 6 involved the "administration of justice," as most courts in this district have recognized.

Section 2J1.2's text, purpose, and commentary all support the conclusion that obstructing Congress's certification of the electoral vote interferes with the "administration of justice." Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government. Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see*

Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is most commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see United States v. Aguilar*, 515 U.S. 593, 599 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons to conclude that "administration of justice" bears its broader (albeit less common) meaning in Section 2J1.2.

First, Section 2J1.2's context and purpose support the broader reading of "administration of justice" in both subsections (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings). See U.S.S.G. § 2J1.2, cmt. (listing covered statutes); U.S.S.G. Appx. A (same). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. § 551; obstructing an investigation under the

Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. § 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline, the enhancements under subsection (b) could not apply to those offenses. That is good reason to reject such a reading, as multiple judges have recognized. *See United States v. Rubenacker*, No. 21-cr-193 (May 26, 2022), Sent. Hrg. Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense."); *United States v. Wright*, No. 21-cr-341 (CKK), 2023 WL 2387816, at *5 (D.D.C. Mar. 4, 2023) ("To suggest . . . that the specific offense characteristics of § 2J1.2 only apply to some of the statutes referenced—would be counterintuitive and an unreasonable interpretation."). Moreover, as Judge Mehta observed, "[i]t would seem very odd" for the guidelines "to carve out" Section 1512 official proceedings in particular— "a type of proceeding that Congress expressly held would be subject to and the object of obstructive conduct before it"—without the guidelines "expressly saying so." *United States v. Rhodes, III, et al*., 22-cr-15 (APM), 5/24/23 Sent. Hrg. Tr. at 7.

Similarly, Section 2J1.2's background reaffirms that Section 2J1.2 broadly covers crimes such as intercepting grand jury deliberations, interfering with an illegal gambling investigation, or

obstructing "a civil or administrative proceeding." U.S.S.G. § 2J1.2, cmt. bkgd. The background then states that the "specific offense characteristics" at issue here "reflect the more serious forms of obstruction," *id.*, again indicating that those enhancements apply to the many obstruction offenses covered by Section 2J1.2 that do not involve interference with judicial proceedings.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to "include" the following: "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2, cmt. N.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that would ordinarily include congressional resources.

Reading the commentary's use of the term "governmental . . . resources" to include congressional resources would not render the phrase "or court" superfluous. The purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches, but not the judicial. Besides, even if a broad definition of "governmental" could include "court" resources, using both terms to clearly sweep in all three branches of government is hardly an obvious superfluity. Moreover, if the term "administration of justice" in § 2J1.2 refers only to a judicial or related proceeding, then the word "governmental" is itself overbroad, as the ordinary reading of that term extends beyond judicial proceedings.

Bru's argument also relies on the idea that if the legislature is not included in

"governmental" in Section 2J1.2's definition, then a congressional proceeding cannot involve the administration of justice—that is, that Section 2J1.2's definition provides an exhaustive list of what constitutes the "administration of justice." But that's not true. "The term 'includes' clearly indicates that the subsequent listing of acts warranting this enhancement is not exclusive, and that other acts—if similarly, or even more disruptive of the administration of justice—could serve as bases for the section 2J1.2(b)(2) enhancement." *United States v. Amer*, 110 F.3d 873, 885 (2d Cir. 1997); *Wright*, 2023 WL 2387816, at *6. As Judge Mehta observed in the *Rhodes, III* sentencing: "the definition begins with the word 'includes,' and the Guidelines specifically define and state the word 'includes'—look at 1B1.1, Note 2—that 'includes' means that the list is not exhaustive. It is 'merely illustrative.'" *Rhodes, III*, Sentencing Ex. K at 10. Meanwhile, "[t]he canon of expressio unius est exclusion alterius— 'mention of one thing implies exclusion of another thing,'—does not apply when context does not indicate that the list is meant to be exclusive." *Wright*, 2023 WL 2387816, at *6 (citations omitted). Thus, Section 2J1.2's commentary's list of illustrative examples does not narrow the meaning of "administration of justice," which as noted above must be broad enough to encompass the statutes the Commission determined were subject to Section 2J1.2.

At least thirteen other judges in this District have applied at least one of Section 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6: Judge Howell (*United States v. Rubenacker*, 21-cr-193); Judge Mehta (*United States v. Rhodes et al.*, 22-cr-15), Judge Contreras (*United States v. Andries*, 21-cr- 93); Judge Cooper (*United States v. Robertson*, 21-cr-34); Judge Chutkan (*United States v. Priola*, 22-cr-242); Judge Moss (*United*

*States v. Miller*, 21-cr-75); Judge Kelly (*United States v. Pruitt*, 21-cr-23); Judge Friedrich (*United States v. Reffitt*, 21-cr-32); Judge Hogan (*United States v. Tenney*, 21-cr-640); Judge Friedman (*United States v. Puma*, 21-cr-454); Judge Bates (*United States v. Brock*, 21-cr-140); Judge Lamberth (*United States v. Worrell*, 21-cr-292), and Judge Kollar-Kotelly (*Wright*, 2023 WL 2387816, at *4-13).[13]

Outside of the January 6 context, other courts have also applied the "administration of justice" enhancements in Section 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (defendant obstructed proceeding by kidnapping children and transporting them internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (defendant withheld subpoenaed documents from a congressional subcommittee).

The Electoral College certification vote on January 6 falls comfortably within the meaning of "administration of justice" as used in Section 2J1.2 because it involved Congress's performance of duties required by law. Application of both Sections 2J1.2(b)(1)(B) and (b)(2) is therefore appropriate here.

### 2.  Factual Application of U.S.S.G. § 2J1.2(b)(1)(B)

Alternatively, Bru contends that even if the Electoral College certification qualified as

---

[13] The only judge who has consistently found that the enhancements do not apply to Section 1512(c)(2) offenses is Judge McFadden, as in *United States v. Hale-Cusanelli*, No. 21-cr-37.

"administration of justice," Section 2J1.2(b)(1)(B) does not apply here as a factual matter because there is no evidence that Bru caused or threatened injury to obstruct the Electoral College certification. ECF No. 89 at 1–2. Again, Bru is incorrect.

Contrary to Bru's assumption, the government does not contend that he intended to threaten police officers on the West Plaza by repeatedly screaming "you will die for the corporation" at them. Considered in the context of Bru's apparent sovereign citizen ideology, his message was likely intended as a warning to the police officers that they were risking their lives to protect a corrupt corporation (which Bru believed the federal government to be), not democratic principles.

Instead, Probation and the government base the application of § 2J1.2(b)(1)(B) on Bru's actions, not just his words, during that same confrontation with the police. Bru's persistent pushing on the metal bike-rack barricade on the West Plaza, putting his entire body weight behind the effort, undoubtedly constituted a threat to obstruct the certification. That bike rack, held in place by overwhelmed and outnumbered officers, served as a crucial protective barrier between the rioters and those inside the Capitol who were attempting to certify the vote. Bru's motive in pushing the barrier into the police line was clear: he wanted to break that line so that the rioters could enter the Capitol and take control of the government. The foreseeable, intended, and eventual consequences of breaking the line included a flood of rioters—Bru among them—overtaking the West Plaza and, not long after, the Capitol building. Bru's attack on the bike-rack barricade placed the vulnerable officers at risk of serious bodily injury, and it did the same for the government officials inside the Capitol who were depending on the officers' protection. Inspector Loyd understood it as such a threat, taking the extraordinary step of joining the line and attempting to

punch Bru in response. The Court can also consider the context of this push, which came after Bru descended on and breached the Capitol with dozens of other Proud Boys, many dressed in tactical gear, and screamed at officers.

Though Bru feels that he is less deserving of an eight-level enhancement when compared to rioters who assaulted police officers and caused property damage, he is not. Courts in this district have previously applied the enhancement in the cases of similarly situated defendants who *attempted* or threatened physical injury or property damage. For example, in *United States v. Eric Herrera*, 21-cr-619 (BAH), the defendant, like Bru, did not injure officers or destroy property. Herrera's most notable action, aside from joining the riotous mob, was throwing a stack of papers in the Senate Parliamentarian's offices. Yet the Court applied the eight-level enhancement over Herrera's objections. *See* Sent. Hrg. Tr. at 56 ("The fact that [Herrera] never shouted explicit threats or personally confronted law enforcement officers or physically touched a law enforcement officer does not preclude application of the eight-level [enhancement] to his case. He intentionally joined a mob, [and] entered the Capitol in violation of the law."); *see also United States v. Anthony Williams*, No. 21-cr-377 (BAH), Sent. Hrg. Tr. at 41–42 ("The fact that [the defendant] never shouted explicit threats or chased a specific individual officer or swung a physical object at an individual officer does not preclude application of the eight-level [enhancement] in this case. When Mr. Williams intentionally joined a mob . . . when he entered the Capitol in violation of the law and, once inside, disobeyed police orders to leave and pressed forward with a threatening, yelling, loud, angry mob, he threatened the safety of the officers and everybody else inside the building given their overwhelming numbers of the mob."); *see also Tenney,* 21-cr-640 (applying

the eight-level enhancement over objection where defendant was not convicted of violating 18 U.S.C. § 111(a)).

Thus, because Bru's actions threatened to cause injury "to obstruct the administration of justice," the eight-level enhancement under § 2J1.2(b)(1)(B) applies.

## X.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bru's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis.

Bru was no passive observer. After arriving on Capitol grounds with his fellow Proud Boys, he became part of the first wave of rioters to breach the restricted perimeter, stepping over fencing and signage on his way to verbally harass and intimidate police. He then joined with other rioters to physically break a recently reinforced police line, pushing a metal bike rack into officers. When the opportunity arose, Bru entered the Capitol building and immediately headed to the Senate Gallery, overlooking the Senate floor, a sensitive and sacred space. There, he took selfies to celebrate his victory: occupying the U.S. Capitol and physically preventing the Electoral College certification from occurring by his presence.

The nature and circumstances of Bru's offenses were of the utmost seriousness, and fully

support the government's recommended sentence of 87 months of imprisonment followed by three years of supervised release, a fine of $7,946, $2,000 in restitution, and the mandatory special assessment of $280.

### B.  The History and Characteristics of the Defendant

Bru, last known to reside in Vancouver, Washington, refused to be interviewed by Probation, so information regarding Bru's personal history is not included in the PSR. Bru was, however, willing to provide a detailed account of his background in a letter to The Gateway Pundit, which he wrote after trial.

In Bru's letter, he describes what sounds like a stable upbringing in the Pacific Northwest, along with a supportive family. He reports that he attended private and public schools until, due to his confessed issues with authority figures, he began to "reject formal education" while in junior high school. He did, however, obtain his GED. In addition, at some point before January 6, 2021, Bru joined the Washington State Militia Committee of Correspondence.[14]  Trial Ex. 707.

Though Bru's pre-January 6, 2021 criminal history is minimal, since his arrest in this case, he has racked up three arrests, two pending drunk driving cases, and a litany of pretrial violations:

- On January 2, 2022, Bru was found guilty of speeding in Oregon. PSR ¶ 73.

- On February 16, 2023, Bru was arrested in Coeur D'Alene, Idaho for driving under the influence and driving with a suspended or revoked license. PSR ¶ 76. Bru then failed to appear for his scheduled trial. A bench warrant was issued, and the case remains pending. *Id*.

- On May 28, 2023, Bru was arrested in Belgrade, Montana for driving under the influence,

---

[14]  Washington's Constitution forbids private military units from operating outside of state authority. WASH. CONST. art. I, § 18. Washington law also makes it illegal for groups of people to organize as private militias without permission from the state. Wash. Rev. Code § 38.40.120.

driving with a suspended or revoked license, and failing to carry proof of insurance. After failing to appear at a hearing, a bench warrant was issued. The case remains pending. PSR ¶ 77.

- On June 23, 2023, Bru failed to appear at a pretrial conference in this case. On June 30, 2023, after posting his alarming and defiant tweets, Bru again failed to appear at a scheduled hearing in this case and the Court issued a bench warrant. PSR ¶ 11.

- On July 23, 2023, after responding to the scene of an accident, local police in Gallatin, Montana arrested Bru for driving with a suspended or revoked license and operating a vehicle without insurance. Due to his outstanding arrest warrant in this case, Bru was quickly transferred to the custody of the U.S. Marshals to face trial in D.C. A bench warrant was later issued in the Gallatin County case. The case remains pending. PSR ¶ 23.

In part because Bru failed to appear, he has not yet been convicted in the two drunk-driving cases, and thus receives no criminal history points for them. His criminal history is therefore understated, meriting an upward adjustment under Section 3553(a).

The Court should also consider that Bru has engaged in multiple forms of obstructive conduct. First, he deleted his Facebook posts; second, he failed to appear at his pretrial conference; and third, he absconded. *See* U.S.S.G. § 3A1.4 cmt n.4(D), (E) (listing as examples of obstructive conduct "destroying…evidence that is material to an official investigation or judicial proceeding" and "willfully failing to appear, as ordered, for a judicial proceeding"). Bru, however, can receive only one two-point obstruction enhancement, despite engaging in three acts of obstruction. The Court should impose a higher sentence under Section 3553(a) to account for this fact.

Bru's history and characteristics also include a complete lack of remorse and failure to accept any responsibility for his actions. Indeed, Bru is amongst the least remorseful January 6 defendants, and few accept responsibility less. Not only does Bru refuse to accept that what he did

was wrong and fail display an ounce of regret to officers harmed that day, but as detailed *supra* in Section II, his February 2021 text messages to a Proud Boys recruit indicate that Bru wanted to *do it all again*, to repeat the violence and lawlessness of January 6 in Portland in order to take over the local government. In fact, those text messages indicate that Bru's chief takeaway from January 6 is that it was *not violent enough* or not sufficiently dedicated to overthrowing the government. In furtherance of this plot, he recruited at least one other individual and took steps to purchase gas masks in bulk. Thankfully, police officers arrested Bru a few weeks later. In other words, in the aftermath of January 6, Bru was plotting an armed insurrection, not feeling remorseful. He does not respect the rule of law, as evidenced by his refusal to even accept the basic tenets of the government's authority to prosecute him or the Court's authority to hear his case. Bru's public statements to the Freedom Corner and The Gateway Pundit following his trial only further underscore this point.

In sum, before January 6, 2021, Bru, though perhaps lacking respect for the law and the government's enforcement authority, generally led a law-abiding life. But as evinced by Bru's criminal actions on and after January 6, his thwarted plans for a January 6 2.0, and his post-trial anarchistic statements, he no longer intends to live such a life. His self-professed, long-standing aversion towards authority has won out. Thus, Bru's history and characteristics weigh heavily in favor of a lengthy term of incarceration.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Bru's criminal conduct on January 6 and in the time since epitomizes disrespect for the law. Bru's decision to abscond and his refusal to "consent" to his trial are just two examples demonstrating the need to promote respect for the law in this case, even above and beyond Bru's criminal conduct on January 6.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

There is an additional reason why this case in particular requires a lengthy sentence of incarceration: Bru committed new crimes while on pretrial release and then chose to flee three separate cases rather than face accountability. Many other defendants—January 6 and otherwise—have been in Bru's pretrial position, *i.e.*, released pending trial or sentencing, and facing serious charges or sentences. Some committed new crimes while on pretrial release. *See, e.g.*, *United States v. Woods*, 21-cr-476 (APM); *United States v. Miller*, 21-cr-119 (CJN). A few, like Bru,

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

37

absconded, fled, or failed to appear. *See, e.g.*, *United States v. Burlew*, 21-cr-647 (RDM); *United States v. Olivia Pollock*, 21-cr-447-5 (CJN); *United States v. Worrell*, 21-cr-292 (RCL). The government is aware of only one other January 6 defendant who both committed a new crime while on pretrial release and later absconded, fled, or failed to appear. *See United States v. Neely*, 21-cr-642 (JDB). Bru's disappearance attracted national media attention. The Court should impose a lengthy sentence of incarceration to deter other defendants from similarly violating their conditions of pretrial release. Defendants and the public must know that such conduct carries a cost at sentencing.

### *Specific Deterrence*

The evidence also indicates that a lengthy sentence of incarceration is necessary to deter Bru specifically. Indeed, this may be the most significant sentencing factor in this case.

First, as discussed above, despite Bru's criminal history category of I, his recent history of arrests and pretrial violations, as well as his statements during and after trial, collectively reveal a clear pattern of disrespect for the law and the criminal justice system. *See* Section VII(B) *supra*. Second, to date, Bru has not expressed a modicum of remorse or regret for either his conduct on January 6 or the events of the day more generally. To the contrary, both before and after trial, through a multitude of public platforms and court filings, Bru has deflected blame and promoted wild conspiracy theories, claimed victimhood, and lied to escape the consequences of his actions. Finally, Bru has *already* revealed his specific intent to commit the same (or worse) offenses again. In a February 23, 2021 text message to an apparent Proud Boys recruit, Bru called for thousands of "patriots" to forcibly occupy government buildings, including the courts, if necessary, in

Portland. *See* Trial Ex. 904. He wanted a repeat of January 6, only he implied this time would be more violent. *See id.* Bru planned for those "patriots" to "overwhelm" local police forces, even SWAT teams, who would be powerless to stop them, and that the result would be "like pulling the teeth out of the dogs mouth." *Id.* Once Bru and his fellow "patriots" defeated the police, they could "deconstruct the comms transmitters and such," leaving the government unable to communicate and rendering it, including the courts, powerless to stop them. *Id.* Bru appears to have envisioned and been planning for a true armed insurrection, and from his post-conviction comments, he appears only to have become further radicalized and angry since then.

Only a severe punishment has a chance of deterring Bru from using and threatening violence in pursuit of his political goals and from continuing to actively disrespect the rule of law.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

In cases where the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[17]

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[17] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*United States v. Thomas Robertson*, No. 21-cr-34 (CRC), shares much in common with this case. Robertson, like Bru, contributed to the chaos on the West Plaza, physically blocked officers' efforts to control the crowd, wore protective gear on his face in anticipation of violence, and destroyed evidence, but did not assault officers or remain inside the Capitol for a substantial time. Robertson and Bru were both convicted after trial of the same two felonies—violations of 18 U.S.C. §§ 1512(c)(2) and 231(a)(3)—as well as related misdemeanors. The key differences between the *Bru* and *Robertson* cases balance each other. While Robertson was a police sergeant, carried a wooden pole with him into the Capitol, and exercised control of firearms following his arrest, Robertson did not use physical force to help break the line on the West Plaza, did not march straight to the Capitol with an organized group such as the Proud Boys, did not go all the way to the Senate Chamber, left the Capitol when asked to by USCP officers, took full accountability for his actions prior to sentencing, and did not abscond. Judge Cooper sentenced Robertson to 87 months of incarceration.

Another useful comparator is *United States v. Anthony Williams*, No. 21-cr-377 (BAH). Williams, like Bru, believed the 2020 election to be fraudulent and educated himself on the mechanics of the certification process before January 6. Williams was among the first wave of rioters to breach the Senate Wing Doors, while Bru was among the first wave of rioters to breach the restricted perimeter and the Upper West Terrace doors. Both men have had many contacts with the criminal justice system, yet both only earned a criminal history category of I. Both Williams and Bru physically resisted officers' efforts to hold back or remove rioters from the grounds and within the Capitol building. And both deflected blame and celebrated their conduct on social media

after the riot. Unlike Bru, however, Williams was not convicted of violating 18 U.S.C. § 231(a)(3) or 40 U.S.C. § 5104(e)(2)(B), and Williams expressed remorse by apologizing at sentencing to the Court, the residents of Washington, D.C., the police, and Congressmembers and their staff for his actions on January 6. Further, Williams did not enter a sensitive area of the Capitol building, did not take aggressive physical actions against officers, and did not abscond. Judge Howell sentenced Williams to 60 months of incarceration. Given the additional aggravating factors and convictions in Bru's case, as well as Bru's continued refusal to accept responsibility or show remorse, he is deserving of a significantly harsher sentence.

One final comparator for the Court's consideration is *United States v. Gilbert Fonticoba*, No. 21-cr-638 (TJK). In that case, following a stipulated trial, the Court found Fonticoba guilty of violating 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231(a)(3). The cases are similar in many respects. Like Bru, Fonticoba was a member of the Proud Boys on January 6, 2021, and was among the first wave of rioters to breach the restricted perimeter. Fonticoba helped the mob advance by destroying fencing, while Bru helped the mob advance by pushing against the police line on the West Plaza. Neither Bru nor Fonticoba assaulted officers. And both men have a criminal history category of I.

After calculating Fonticoba's Guidelines range to be 51 to 63 months, Judge Kelly sentenced Fonticoba to 48 months' incarceration. But as with the *Williams* case comparator, there are key distinctions between Bru's and Fonticoba's conduct that mandate a harsher sentence here. First, Fonticoba accepted responsibility for his actions via a stipulated trial and an emotional statement at sentencing, while Bru prolonged his trial date and is further from accepting responsibility for his conduct than ever. Second, Fonticoba was compliant on pretrial release, while

Bru was arrested three times and absconded. And third, unlike Bru, Fonticoba had a host of health conditions, familial obligations, and community support that the Court took into consideration. No such mitigating factors exist here. Thus, a sentence of 87 months' incarceration is appropriate in this case.

## XI.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because Bru was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes are found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that the sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires the imposition of full restitution without respect to a defendant's ability to pay.[18]

Because Bru engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold

---

[18] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Bru to pay $2,000 in restitution for his convictions on Counts 1, 2, 6, and 7. This amount fairly reflects Bru's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## XII.   FINE

Bru's convictions under Sections 231 and 1512 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18

U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

As the revised PSR notes, Bru has not demonstrated an inability to pay a fine. PSR ¶ 94; *see United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994) ("The burden is on the defendant to establish his present and future inability to pay."). Indeed, he failed to provide Probation with financial disclosures. PSR ¶ 91.

A fine is appropriate in this case. Despite receiving court-appointed counsel, which he rejected to proceed *pro se*, Bru has raised thousands of dollars in an online GiveSendGo campaign titled "Marc Anthony Bru J6 Political Prisoner of War." PSR ¶ 92. Although the fundraising page indicates that "The funds from this campaign will be received by Diane Morris" (Bru's mother), the page lists Marc Bru as the "Campaign Creator," Bru has personally promoted the page in his many calls to the "Freedom Corner," and Bru is obviously the intended beneficiary of any money collected.

As of January 16, 2024, Bru had raised $7,946 via the GiveSendGo fundraising page. The website does not indicate how Bru intends to use the donated funds, but none of it can be attributed to legal expenses because Bru does not have any. Despite proceeding *pro se*, Bru has relied on his stand-by counsel to bear the labor and costs associated with legitimate court filings and discovery review. Moreover, given Bru's refusal to "consent" to these proceedings and clear lack of preparation for trial, he cannot credibly argue that the funds are intended to cover any personal

legal costs. Thus, Bru should not be able to profit from his participation in the Capitol breach in this way, and the Court should impose a fine equivalent to the amount raised through the online campaign on the back of his alleged patriotism on January 6 and persecution since: $7,946. Once the Court conducts "an 'appropriate inquiry' as to the availability of the funds for payment," *United States v. Homrighausen*, 366 F. App'x 76, 77 (11th Cir. 2010), any money collected via the fine from Bru's GiveSendGo account can be used to reimburse the cost of providing Bru with court-appointed counsel, *see* 18 U.S.C. § 3006A(f).[19]

## XIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 87 months of imprisonment followed by three years of supervised release, a fine of $7,946, $2,000 in restitution, and the mandatory special assessment of $280.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

---

[19] The Criminal Justice Act ("CJA") requires district courts to provide legal counsel for criminal defendants charged with a felony when they are unable to pay for an attorney. 18 U.S.C. § 3006A(a)(1)(A). By that same token, the plain language of the CJA authorizes the Court to order repayment of court-appointed attorney fees and expenses if it finds that funds are available to the defendant to pay such fees.

Specifically, if—at any time after counsel is appointed—the court "finds that the person is financially able to obtain counsel or make partial payment for the representation, it may . . . authorize payment as provided in subsection (f), as the interests of justice may dictate." *Id.* § 3006A(c); *see United States v. Wilson*, 597 F.3d 353, 357 (6th Cir. 2010) ("What the [CJA] gives with one hand to a criminal defendant 'financially unable' to pay for legal services it takes away with the other if the defendant turns out to be 'financially able' to obtain counsel").

By:      */s/ Michael M. Gordon*
MICHAEL M. GORDON
Senior Trial Counsel, Capitol Siege Section
Assistant United States Attorney
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, Florida 33606
michael.gordon3@usdoj.gov
(813) 274-6370


*/s/ Madison H. Mumma*
MADISON H. MUMMA
Trial Attorney
N.C. Bar No. 56546
1301 New York Ave. NW
Washington, D.C. 20530
madison.mumma@usdoj.gov
(202) 913-4794

49