Ben W. Muse
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, Alaska 99503
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: ben_muse@fd.org

*Standby Counsel for Defendant Marc Bru*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MARC BRU,

Defendant.

Case No. 21-cr-00352-JEB

**SENTENCING MEMORANDUM FILED AT THE REQUEST OF THE DEFENDANT BY STANDBY COUNSEL[1]**

## I. INTRODUCTION

At Mr. Bru's initial sentencing in January 2024, the Court stated that if Mr. Bru's 18 U.S.C. § 1512 conviction—which drove the Guideline calculation in the PSR—was subsequently set aside and Mr. Bru's Guidelines were significantly lower, the Court would still impose the same sentence of 72 months.[2] If that remains the case, the Court can stop reading.

---

[1] Mr. Bru informed standby counsel that he does not intend to speak at his sentencing hearing and that he wanted counsel to make argument on his behalf.

[2] Dkt. 100 at 15.

This sentencing memorandum will ask the Court to reconsider this pronouncement and to resentence Mr. Bru to a term in line with his actual sentencing Guideline and comparable to that received by other similarly situated defendants.

A sentence of 72 months—roughly six times the upper end of the Guidelines for Mr. Bru's offense (6-12 months)—is grossly disproportionate to the conduct of conviction and does not work a just result in this case. Here, the Court previously sentenced Bru, a 44-year-old with no criminal history, who is at most, an idealogue and nuisance, to the type of sentence typically—in the experience of counsel—reserved for recidivists guilty of violent offenses or serious property crimes, *e.g.*, The burglar entering the home of a sleeping family or a serial perpetrator of domestic violence.

Doubtlessly, the events of January 6, 2021, were a serious blemish on our nation's history. It's impossible based on the evidence to conclude otherwise. Police officers were assaulted, property was destroyed, and Congress, and the lives of D.C. residents, were thrown into disorder.

But Bru did not engage in this violence. He went to the Capitol grounds on January 6 to protest the results of the presidential election that he believed were secured through fraud. He stood in the crowd on the West Plaza and shouted at the police. He *briefly* resisted the efforts of law enforcement to force the growing crowd back from the Capitol with bike racks by leaning against the advancing rack for several seconds. And he followed other protestors through open doors into the Capitol, where he remained inside for 15 minutes. In sum, Bru engaged in civil disobedience in a boisterous but non-violent manner. As he has proclaimed,

he would do so again[3] because he sincerely believed the claims of President Trump and his supporters that the presidential election was "rigged", and the survival of democracy was at stake. His actions should be viewed for what they are and not conflated with those of other violent bad actors.

Admittedly, following his arrest, Bru has frustrated the criminal process at several points, mainly because he felt he and other January 6 defendants were being treated differently as a class than other protestors who have engaged in disruptive acts of civil disobedience at the Capitol or in different cities around the country. But this being the case, his behavior was not, as the government contends, worthy of the 72-month sentence imposed by the Court.

The Court should adhere to the Guidelines (6-12 months), which account for Bru's failure to accept responsibility, and his obstructive activity, and it should sentence him on Counts 1-6 to an aggregate sentence of the time he has already served (approximately 15 months). Such a sentence is proportionate to his conduct, accounts for his lack of criminal history, and achieves the sentencing objectives of section 3553(a)(2).

## II. FACTUAL BACKGROUND

Marc Bru believed that President Biden was elected through fraudulent means and went to Washington, D.C., on January 6, 2021, to protest the results of the presidential election. On January 6, he marched with members of the group the "Proud Boys" from the "Ellipse" through the "Peace Circle," past downed barricades and "closed" signs, to the West Plaza of the

[3] Dkt. 100, at 15 ("You can give me a hundred years, and I would do it all over again.).

Capitol.[4] As he approached the West Plaza, he yelled at several police officers that they were going to die for the "corporation,"*i.e.*, what he perceived to be a corrupt government.[5] Bru joined a growing crowd of protestors assembling in the West Plaza. Elements of this crowd became unruly and violent. Officers on the scene established a police line reinforced with "bike racks" or barricades and attempted to control the gathered crowd, using the bike racks to force it back from the Capitol.[6] Bru briefly resisted this effort by pushing back on a bike rack for several seconds before being pepper-sprayed and punched in the face by officers.[7]

At around 2:12 p.m., protestors breached the police line and entered the Capitol by, in many cases, breaking into the building.[8] At this point, the "House and Senate chambers locked down and sheltered in place."[9]

At around 2:36 p.m., Mr. Bru entered the Capitol, following other protestors through an open door on the Upper West Terrace after police officers stood aside to allow entry.[10] As he entered, Bru had his cellular phone out, apparently to video record what was taking place inside the Capitol.[11] At 2:42 p.m., he entered the upper gallery of the Senate.[12] Bru spent about

---

4 Exh. D-3 88-94
5 Exh. D-3 at 47.
6 Exh. D-3 at 47-48.
7 Exh. D-3 at 48-50. Gov. Tr. Exh. 401, 504.
8 Exh. D-3 at 52
9 Exh. D-3 at 53.
10 Exh. D-3 at 91-99.
11 Exh. D-3 at 96.
12 Exh. D-3 at 102.

three minutes inside and took several "selfies" of himself in the Senate gallery.[13] In total, Bru spent about 15 minutes inside the Capitol.[14]

## III. GUIDELINE CALCULATION

In this case, the Guidelines only apply to Counts 1, 2, and 6. The PSR-writer has correctly concluded that these counts group.[15] However, neither the PSR-writer nor the Court have determined the appropriate Guideline for these Counts.

There is no dispute that Mr. Bru has zero criminal history points and falls in Criminal History Category I. There is some dispute as to the applicable offense level for the grouped counts. Mr. Bru calculates his offense level as follows:

| Offense Level | Adjustment | Reason |
|---|---|---|
| 10 | Base Offense Level | U.S.S.G. §§2X5.1; 3D1.2(c); 2A2.4. |
| 12 | U.S.S.G. §3C1.1—Upward adjustment for obstruction of justice. (+2) | Mr. Bru absconded from pretrial supervision. |
| 10 | U.S.S.G. §4C1.1—Downward adjustment for zero-point offender (-2) | Mr. Bru is a "zero-point offender" who meets the criteria in §4C1.1. Contrary to the government's position, his pushing back on a bike fence for several seconds before getting punched and pepper sprayed does not constitute the use of violence. |
| **TOTAL OFFENSE LEVEL** | 10 | |

13 Exh. D-3 at 102-104.
14 Exh. D-3 at 104.
15 Dkt. 90, ¶ 57.

Accordingly, as Mr. Bru's Total Offense Level is 10, and as he is in Criminal History Category I, his applicable Guideline is 6-12 months for the grouped counts.

The government contends that the offense level for these Counts is 15.[16] It argues that an adjustment applies under §2A2.4(b)(1)(A), for making "physical contact" with a government officer performing official duties.[17] Further, the government contends that the Zero-Point Offender adjustment does not apply to Bru given the facts of his case.

### A. Mr. Bru Did Not Make "Physical Contact" with a Government Officer Performing Official Duties.

In this case, several police officers attempted to advance a temporary police line of bike racks toward the gathered protesters to move them back from the Capitol. In exhibit 401 introduced by the government, Mr. Bru appears to have resisted these efforts by briefly leaning back on the fence for several seconds before being maced by Capitol police and punched in the head. Inspector Loyd testified that Bru was trying to "disassemble the temporary police line" by "physically grabbing on the …bike rack."[18] Loyd stated that, in response, he punched Bru in the head.[19]

The government claims that the bike rack touched a Capitol police officer and this constituted "physical contact" with Mr. Bru, thus Bru should receive a three-level enhancement under §2A2.4(b)(1)(A).[20]

---

16 Dkt. 92-1 at 4.
17 Dkt. 92-1 at 4.
18 Exh. D-1 at 48.
19 Exh. D-1 at 48-49.
20 Dkt. 92-1 at 4.

While Mr. Bru may have *briefly* frustrated the efforts of the officers advancing the bike rack, it does not appear his actions constitute the type of "physical contact" intended by the Guideline. Of note, this three-level enhancement is also available if someone threatens a police officer with a weapon.[21] Given the severe nature of this equivalent adjustment, it seems likely the Sentencing Commission intended a more egregious level of physical contact than merely touching an object that someone else was touching.

Further, while the video shows Mr. Bru exerting force on the bike rack, with others, there is no clear evidence that he pushed the bike rack into an officer. Rather the video seems to show that the officer stepped back from the bike rack when the protestors advanced and removed his pepper spray which he proceeded to discharge.[22]

The only point in which Mr. Bru clearly had physical contact with an officer was when Inspector Loyd punched Bru in the head.

**B. The Zero-Point Offender Adjustment Should Apply.**

The Guidelines do not explain what it means to use "violence…in connection with the offense."[23] As another District Court has found, a Court should turn to the dictionary to define the term:

> Contemporary dictionaries define "violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." *Violence*, Black's Law Dictionary (11th ed. 2019); *see Pineda-Duarte*, 933 F.3d at 523 (citing Black's Law Dictionary for definition of "violence" in interpreting U.S.S.G. § 2D1.1). Or, similarly, "violence" is the "exertion of any

---

21 *See* U.S.S.G. § 2A2.4(b)(1)(B).

22 *See* Gov. Tr. Exh. 401.

23 U.S.S.G. §4C1.1(a)(3)(providing adjustment only available if "defendant did not use violence or credible threats of violence in connection with the offense.").

> physical force so as to injure or abuse." *Violence*, Webster's Third New International Dictionary (1993).[24]

In *Bauer*, the Court determined that the defendant committed a violent act by physically touching and aggressively shoving a police officer while yelling "fuck you, you fucking bitch."[25]

Mr. Bru is a "zero-point offender" who meets the criteria in §4C1.1. Here, the government contends Bru is ineligible for a "zero-offender" adjustment under §4C1.1 because he used "violence…in connection with the offense."[26] While it is inarguable that Mr. Bru used some degree of force in pushing back on the barrier, he did not use "violence" as his brief resistance was not intended to harm the officers.

**IV. An Application of the § 3553(a) Factors Supports a Time-Served Sentence.**

The Court's task in sentencing is to identify and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.[27] Although the Sentencing Guidelines are the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable."[28] Instead, the Court "must make an individualized assessment based on the facts" of each case, through the lens of the factors outlined in 18 U.S.C. § 3553(a),[29] recognizing that a within-guidelines sentence may be greater

---

24 *United States v. Bauer*, 714 F. Supp. 3d 1, 5 (D.D.C. 2024).

25 *Id.*

26 U.S.S.G. §4C1.1(a)(3)(providing adjustment only available if "defendant did not use violence or credible threats of violence in connection with the offense.").

27 18 U.S.C. § 3553(a).

28 *Gall v. United States*, 552 U.S. 38, 50 (2007).

29 (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the purposes of sentencing, including the need for deterrence and to protect the

than necessary to serve the purposes of sentencing.[30] "[T]he amount by which a sentence deviates from the applicable Guidelines range is not a measure of how 'reasonable' a sentence is. Reasonableness is determined instead by the district court's individualized application of the statutory sentencing factors."[31]

This memorandum will examine why the sentencing factors relevant to this case support the imposition of a time-served sentence.

**A. The Non-Aggravated Nature and Circumstances of the Offense Support a Time-Served Sentence.**

President Trump asserted that the results of the 2020 election were illegitimate and that a massive fraud had taken place. He encouraged his supporters, explicitly and implicitly, to engage in acts of civil disobedience to protest the election results.

Mr. Bru, sincerely believing the assertions made by the President, and believing that the future of U.S. democracy was at stake, traveled to Washington, D.C., to engage in civil disobedience. While he protested and ventured into restricted areas of the Capitol, he did not engage in violence or property destruction. Within the spectrum of January 6 cases, his conduct was not aggravated and is consistent with the imposition of a 15-month, time-served sentence.

---

public; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) any relevant policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.

[30] *Gall*, 552 U.S. at 50; *Kimbrough v. United States*, 552 U.S. 85, 91 (2007); *see United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.").

[31] *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47).

### B. The Known History and Characteristics of Mr. Bru Support a Time-Served Sentence.

Mr. Bru has elected to maintain his privacy and has declined to disclose information about his background to the USPO. However, two characteristics are readily apparent—his age and lack of criminal history—and both suggest that he does not pose a risk of recidivism.

At 44, Mr. Bru has no countable criminal history. Statistically, he is unlikely to accrue any in the future. Most criminal-justice-involved individuals deescalate their conduct as they enter their 30s and there's a sharp decline in criminal behavior during middle age.[32] The known history and characteristics of Bru support the imposition of a time-served sentence.

### C. A Time-Served Sentence Achieves General and Specific Deterrence to the Extent This Is Possible Under the Circumstances.

At Mr. Bru's sentencing in January 2024, the government[33] gave particular emphasis to the goal of deterrence in arguing for an 87-month sentence. Under the circumstances, a 72-month sentence does little to achieve this objective and may actually undermine it.

First, research has found little correlation between sentence length and deterrence.[34] Potential criminals are not generally aware of penalties for their prospective crimes, do not

---

32 Marc Mauer, "A Proposal to Reduce Time Served in Federal Prison," Testimony to Charles Colson Task Force on Federal Corrections, 27 Fed. Sent. R. 300, 301, 2015 WL 4199237 (June 1, 2015); *see also* U.S. Sentencing Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 3 (2017) ("Older offenders were substantially less likely than younger offenders to recidivate following release .... The pattern was consistent across age groupings.").

33 Dk. 100 at 14.

34 *See, e.g.*, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006); Charles Loeffler et al., *The Impact of Incarceration on Recidivism*, 5 Annual Review of Criminology 133 (2022), available at https://www.annualreviews.org/doi/full/10.1146/annurev-criminol-030920-112506 ("Most studies we review, in fact, find that the experience of postconviction imprisonment has little impact on the probability of recidivism.").

believe they will be apprehended and convicted, and simply do not consider sentencing consequences in the way an ideal, rational decisionmaker hypothetically would.[35] The Sentencing Commission has even recognized this fact noting that:

> There is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high Guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected. The Guidelines' offense level is not intended or designed to predict recidivism.[36]

Social science research on the subject suggests that it is the certainty of the punishment, rather than the length, that has the deterrent effect.[37] By identifying Mr. Bru within the thousands of protestors and subjecting him to the criminal process for his conduct, it is likely that the government has sufficiently achieved the goal of deterrence.

---

35 *See Id.*; Andrew J. Oswald, *Irrational Actors*, 348 SCI. 1099, 1099 (2015) (discussing the belief that one of the major failings in economics is the misplaced idea that people are rational actors); Gary Kleck, et al., The Missing Link in General Deterrence Theory, 43 Criminology 623 (2005)("There is generally no significant association between perceptions of punishment levels and actual levels…implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms.").

36 *See* U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

37 *See, e.g.*, Mihailis E. Diamantis, *White-Collar Showdown*, 103 Iowa L. Rev. Online 320, 327 (2017)("doubling the chance of capture has a greater deterrent effect than doubling the sanction. This is just a seemingly irrational quirk of white-collar psychology, and one that should affect how we think about deterring white-collar crime.); *See* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 49 n.96 (2015) ("[A] short prison stay ... may not provide more than a marginal impact [for white-collar criminals] beyond the experience of prosecution, conviction, and sentencing." (quoting David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587, 599 (1995)); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just.: A Review of Research 28-29 (2006); Gary Kleck et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995).

Further, the deterrent value of any sentence is severely undercut by the fact that President Trump has openly proclaimed his belief that an injustice had been worked on those like Mr. Bru who participated in the events of January 6 at the Capitol, and that pardons will ensue promptly when he takes office. An NPR review of President Trump's comments since 2021 found:

> [T]hat Trump has made calls to "free" Jan. 6 defendants or promised to issue them presidential pardons more than a dozen times. Trump has said he would issue those pardons on "Day 1" of his presidency, as part of a broader agenda to use presidential power to exact "retribution" against his opponents and deliver "justice" for his supporters.[38]

Specifically, Trump has stated that "[w]e'll be looking very, very seriously at full pardons," for the January 6th defendants, and emphasized that he meant "full pardons with an apology to many."[39] On Truth Social he has posted "LET THE JANUARY 6 PRISONERS GO," and expressed that, "[t]he cops should be charged and the protesters should be freed."[40]

Recently, the DOJ has signaled that it will suspend a case related to January 6 against the president.[41]

---

[38] Tom Dreisbach, Noah Caldwell, *The Trump campaign embraces Jan. 6 rioters with money and pardon promises*, NPR (January 4, 2024), available at https://www.npr.org/2024/01/04/1218672628/the-trump-campaign-embraces-jan-6-rioters-with-money-and-pardon-promises).

[39] *Id.*

[40] *Id.*

[41] On Friday, November 8, 2024, the United States Department of Justice Special Counsel Jack Smith made an unopposed motion to "Vacate Briefing Schedule" in the matter of *United States v. Trump*, 23-cr-00257 (TSC), "to afford the Government time to assess this unprecedented circumstance and determine the appropriate course going forward consistent with Department of Justice policy."

Against this backdrop, how can a sentence have any deterrent effect? Jacob Ware, a research fellow with the Council of Foreign Relations, and author of *God, Guns, and Sedition: Far-Right Terrorism in America*, expressed this notion succinctly in a recent interview:

> The Jan. 6 deterrence factor that you think would be in place based on the charges involved has already been eroded…People were punished for the crimes they committed, and that's important from a criminal justice standpoint. But the deterrence that you would think from this case, the largest investigation in American history, would implement has been eroded from four years of rhetoric calling them warriors, heroes, patriots, political prisoners, martyrs.[42]

It is even arguable that the aggressive positions—such as advocating for a severe 87-month sentence for Mr. Bru—that the DOJ has taken, have done more to radicalize and encourage future misconduct by the president's supporters, playing into the narrative that they are being targeted by an unjust system, that they are political prisoners and hostages.[43]

At his first sentencing hearing, when Mr. Bru said that he would do what he did again even if the Court sentenced him to 100 years, he was not expressing a viewpoint unique to himself, but one widely shared among a significant portion of the population, stretching far beyond the thousands at the Capitol on January 6, and including many

---

42 Antonio Fins, *With Trump's return, are Jan 6 Capitol Rioters off the hook?*, USA Today Network, (Nov. 15, 2024), available at https://www.usatoday.com/story/news/politics/elections/2024/11/15/trump-pardons-jan-6-capitol-rioters/76131551007/ (last visited November 15, 2024).

43 *See, e.g.*, Lauren Ober and Hannah Rosin, *What Really Happened Inside the Patriot Pod*, The Atlantic (October 16, 2024)(" For various reasons, January 6 rioters have been held together in a segregated wing of the D.C. jail that they came to call the "Patriot Pod." They developed their own rituals and inside jokes, and reinforced one another's narratives. Over time, the expected happened: They became further radicalized. And through connections with right-wing media, they have attempted to recast themselves with terms such as *political prisoner* and *hostage*, which the presidential candidate Donald Trump has now adopted as his own.").

members of the conservative political establishment. He believed what he did was a righteous, and morally correct act of civil disobedience.

Mr. Bru has no real criminal record and has been in federal custody for approximately 15 months. This is a significant and life-altering period of incarceration, particularly for someone who has never spent meaningful time incarcerated. To the extent the Court seeks specific deterrence through a custodial sentence, even if Mr. Bru would never concede this point, one would have to believe that this period of incarceration would at least make him reconsider his protest methods in the future.

However, given President Trump's comments regarding the January 6 defendants, which have been echoed by many in the conservative political establishment, and the seemingly widespread belief that the January 6 defendants have been unjustly prosecuted, it is unlikely that the sentence the Court will impose on Mr. Bru will have any general deterrent effect. Rather, a sentence akin to that recommended by the government, far above the Guidelines, would do more to radicalize and encourage future misconduct than it would to deter.

**D. A Time-Served Sentence Will Adequately Protect the Public.**

On January 6 there were certainly a number of bad actors involved who were at the Capitol not to protest but to hurt others, damage property, and foment armed insurrection. Mr. Bru was not among them. Mr. Bru was there to protest what he perceived was an illegitimate election.

His conduct in this case was not violent—he did not assault anyone; he did not destroy any property. He protested, he briefly resisted efforts by law enforcement to push back the crowd with bike racks, and he trespassed inside the Capitol for 15 minutes. His conduct does not indicate any ongoing risk to the public that necessitates continued incarceration.

Nor does Mr. Bru's conduct following January 6 warrant the imposition of the previous sentence imposed by the Court. Much has been made by comments Mr. Bru made in a private conversation, where he fantasized about "occupying" Portland in a similar fashion to the way protestors occupied the Capitol.[44] He did not discuss the use of violence, nor did he seek to obtain weapons or armaments.[45] From these comments, it's difficult to know whether he is fantasizing about armed insurrection, or a destabilizing conservative occupy movement like Occupy Wallstreet or the Capitol Hill Autonomous Zone in Seattle. Mr. Bru has never participated in armed violence. He has sincere, strongly held views, which some might call idiosyncratic, about how the world is organized. Similar views are held by many others. They are not a threat to the public merely because they hold fringe beliefs or have private conversations fantasizing about future participation in protests.

In sum, there is no basis to believe that a time-served sentence of 15 months will do less to protect the public than the sentence imposed by the Court.

---

[44] Dkt. 90, ¶ 34.

[45] While he did seek gas masks, this is consistent with anticipating that crowd control measures might be used to control a protest.

**E. A Time-Served Sentence Avoids Unwarranted Disparity Among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct.**

Here, the 72-month sentence previously imposed by the Court creates a significant disparity between Mr. Bru and other similarly situated defendants, both generally and specifically to the context of January 6.

First, a 72-month sentence is about 5 years more than the average sentence of others similarly situated on the Guidelines sentencing table. The Sentencing Commission data shows that:

> During the last five fiscal years (FY2019-2023), there were 55 defendants whose primary guideline was §2A2.4, with a Final Offense Level of 10 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 48 defendants (87%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 7 month(s) and the median length of imprisonment imposed was 6 month(s).[46]

Specifically, it is disparate to what other January 6 defendants received from the Court for the offense of Civil Disorder, Mr. Bru's sole felony conviction. This Court has sentenced twelve defendants for civil disorder. The average sentence imposed was 19¼ months.[47] The lowest sentence imposed was 21 days, while the highest sentence, 36 months, was reserved for an

---

[46] United States Sentencing Commission, Judiciary Sentencing INformation (JSIN), *available at* https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

[47] Exh. D-1.

individual, Robert Dennis who was also convicted under 18 U.S.C. § 111(a)(1) of assaulting two police officers, tackling one officer to the ground and punching him in the face.[48]

Further, it is above what other January 6 defendants have received from this Court despite engaging in far more serious, violent conduct. Notably, this Court sentenced Mark Mazza who entered the Capitol armed with a loaded firearm and beat an MPD officer with a baton, to a lower sentence—60 months—than Mr. Bru.[49] Jacob Therres received a 40-month sentence, again for viciously assaulting police officers.[50] Mikhail Slye received a sentence of 30 months for hitting a law enforcement officer with a bike rack.[51] Rodney Milstreed received 60 months after throwing a wooden pick handle at officers and viciously assaulting a member of the press within the Capitol (he later bragged about it stating "I did get to punch a camera man with everything I had brother I felt good. [sic]").[52] Milstreed also made threats on social media about using violence to keep President Trump in power.[53] Justin Adams received 17 months' incarceration after he "charged the police line and attacked one or more MPD officers" punching at least one in the head.[54] Israel Easterday received 30 months' incarceration after macing a Capitol police officer while breaching the Capitol.[55] Gregory

---

48 United States Attorney's Office, District of Columbia, Texas Man Sentenced for Assault on Law Enforcement During Jan. 6 Capitol Breah (April 13, 2023), available at https://www.justice.gov/usao-dc/pr/texas-man-sentenced-assault-law-enforcement-during-jan-6-capitol-breach.

49 Exh. D-2 at 6.

50 Exh. D-2 at 24.

51 Exh. D-2 at 30-31.

52 Exh. D-2 at 15-17.

53 *Id.*

54 Exh. D-2 at 49-50.

55 Exh. D-3 at 53-61.

Yetman, *an enlisted military police officer and member of the National Guard*, received 30 months' incarceration after he assaulted officers with OC spay; when contacted by investigators he fled and an extensive, multi-day manhunt ensued.[56] This conduct is shocking. And each of these violent actors received a sentence less than that imposed on Marc Bru by this Court.

There is a clear disparity which the Court should seek to correct. It should impose a sentence of time-served which aligns with what others convicted of similar conduct have received.

## V. CONCLUSION

There is a chance that the Court's decision at sentencing is largely academic. It appears likely that Mr. Bru will be pardoned by the Trump administration in the coming months. Nevertheless, if nothing else, there is symbolic value in imposing a fair sentence in Mr. Bru's case. One that is consistent with the Guidelines, proportionate to Mr. Bru's conduct, and which affects the desired goals of sentencing outlined in section 3553(a)(2). An aggregate sentence of 15 months, or "time served", across Counts 1-6, is sufficient under the circumstances.

DATED at Anchorage, Alaska this 17th day of November, 2024.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Ben W. Muse*
Ben W. Muse
Assistant Federal Defender

56 Exh. D-2 at 67-69.

Certificate of Service:

I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on November 15, 2024. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.

*/s/ Ben W. Muse*