# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 21-CR-736 (JEB)** |
|  | : |  |
| **v.** | : | **18 U.S.C. §§111(a)(1) and (b)** |
|  | : | **22 D.C. Code §4504** |
| **MARK ANDREW MAZZA** | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Mark Andrew Mazza, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020

**Exhibit D-2 page 1**

Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.     As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5.     At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.     At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

**Exhibit D-2 page 2**

7.     Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Mazza's Participation in the January 6, 2021, Capitol Riot*

8.     The defendant, **Mark Andre Mazza ("Mazza")**, lives in Shelbyville, Indiana. After November 2, 2020, but prior to January 6, Mazza had attended "Stop the Steal" rallies.

9.     On January 5, 2021, Mazza and one of his friends ("F1") traveled from Indiana to Washington, D.C., via a rental car.  The purpose of Mazza and F1's trip to Washington, D.C., was to protest Congress' certification of the Electoral College.  Mazza possessed a concealed firearm permit for the state of Indiana, and prior to departing Indiana, Mazza armed himself a .45 caliber Taurus revolver (the "Judge").  The Taurus Revolver can fire both shotgun shells and regular bullets through the barrel.  Mazza loaded the Taurus with three rounds of .410 gauge shotgun shells and two .45 caliber hollow point rounds.  Mazza did not have a license to carry a firearm or ammunition in the District of Columbia, nor did he register any firearms in the District of

**Exhibit D-2 page 3**

Columbia. On the evening of January 5, 2021, Mazza and F1 stayed at an Airbnb residence in the District of Columbia.

10. On January 6, Mazza and F1 attended the "Stop the Steal" Rally at the Ellipse. Mazza was armed with the Judge revolver in a holster under his shirt located under his arm pit area. At approximately 2:00 PM, Mazza and F1 walked down Pennsylvania Ave., N.W. toward the U.S. Capitol. Mazza and F1 passed over over-thrown bike racks and fencing at the entrance to the Capitol Grounds and moved toward the West side of the U.S. Capitol Building, where fellow protesters were pushing against a police line at the bottom of the stairs up the building. Sometime on U.S. Capitol Grounds before 2:45 PM, Mazza lost possession of his Judge revolver.

11. At approximately 2:50 PM, Mazza and F1 moved up the Northwest staircase of the West Front Terrace of the U.S. Capitol to the Inaugural Stage which had been erected for the 2021 Inauguration. Off the Inaugural Stage was a tunnel in the center of the platform that led to the inside of the U.S. Capitol Building, where numerous members of Congress were sheltering in place. On January 6, 2021, that tunnel led to two sets of locked metal and glass doors that led to a controlled entrance, which contained a magnetometer and portable x-ray machine ("Lower West Terrance"). As of 2:00 p.m. on January 6, 2021, the tunnel entrance doors were locked and closed to the public.

12. At approximately 3:08 p.m. Mazza moved to the tunnel area and observed rioters assaulting officers inside the tunnel. Mazza placed a white scarf with dark stars across his face and approached the tunnel entrance and moved toward the doorway inside the tunnel. After entering the tunnel, Mazza observed numerous acts of violence against the officers while the building alarm to the U.S. Capitol was visibly and audibly sounding. The doors that Mazza approached had broken glass, and armed law enforcement officers were blocking the entire entrance to the doorway

**Exhibit D-2 page 4**

and trying to close the doors. MAZZA then observed and assisted the rioters by pushing with others from behind, as a group, towards MPD and USCP officers who were jointly defending the doorway and keeping rioters from entering the U.S. Capitol. The officers were wearing helmets, body armor, and distinctive police attire emblazoned with the words police and "Metropolitan Police Department." At least 20 MPD and USCP Officers were assisting in blocking the attack inside the tunnel at the time of MAZZA's presence inside the tunnel area, and include: MPD Sergeant W.B., Officer M.F., Officer N.M., Officer H.F., Officer J.P., Officer D.H., Officer P.N. and Officer B.M. While inside the tunnel, Mazza observed fellow rioters forcibly attacking the officers and taking law enforcement riot shields from the officers in the front of the tunnel and giving them to other rioters in the back of the line. Mazza further observed rioters pushing the same law enforcement riot shields toward the front of the line where a group of rioters then used the shields taken from the officers against the law enforcement officers at the front. Mazza personally observed law enforcement officers order the rioters to stop, physically push the crowd back, and deploy OC/pepper spray on the rioters to try and stop the ongoing assault. Mazza further joined in collective efforts of the rioters to push through the officers defending the tunnel entrance.

13.    At approximately 3:13 p.m., Mazza moved to the front of the tunnel line next to the first set of doors in the tunnel. Mazza held open one of the doors, against the direction and active resistance of the MPD and USCP officers in the tunnel, and as he did so, other rioters used flag poles, batons, sticks, and stolen law enforcement shields as weapons to strike at, hit, and try to force their way through, multiple MPD and USCP officers. Inside the tunnel, the officers were actively resisting the rioters and used batons and shields to push back the rioters, including Mazza.

14.     When one MPD officer was using his metal collapsible baton to push back the rioters, Mazza took control of the baton from the officer's hand.  Mazza then armed himself with the baton and swung the baton overhead and downward to strike at the officers in the tunnel entrance.  Mazza's baton struck MPD Officer P.N. in the arm.  After striking at the officers with the baton, Mazza yelled at the officers, "This is our fucking house! We own this house! We want our house! Get out of the citizen of the United States' way!"

15.     After failing to break through the line of officers, Mazza moved from the front of the tunnel to the back of the tunnel area.  Mazza showed other rioters the baton that he had taken from the officers, and he then encouraged other rioters to enter the tunnel area to assist in pushing through the officers.  Mazza pulled other rioters into the tunnel area to attack and push against the MPD Officers at the front of the tunnel.  One of these persons was F1, who was carrying an American flag and wearing a grey and white "Bengals" hat, who entered the tunnel as Mazza continued to persuade other rioters to join in the fight.  *See* Images One and Two (red circle is Mazza, blue circle is F1).

Exhibit D-2 page 6



**Image One**



**Image Two**

Page **7** of **11**

16.     The group of rioters in the tunnel then pushed together forward and yelled "heave-ho!" These "heave-ho" efforts - by which multiple rioters collectively used their body mass for greater force in pushing back officers by gaining momentum through leaning back and then pushing forward while chanting "heave-ho" to coordinate their efforts - resulted in significant physical force and pressure being placed upon the officers at the front of the tunnel. While engaged in the "heave-ho" efforts, Mazza was armed with the baton. The "heave-ho" efforts were partially successful in moving the officer line from the first set of doors inside the tunnel to the second (and last) set of doors in the tunnel area. Mazza was eventually pushed out of the tunnel by the officers who exerted physical force to expel the rioters from the tunnel area. Shortly after being pushed out of the tunnel, at approximately 3:20 PM, MPD Officer M.F. was dragged by rioters from the tunnel area. Mazza was in close physical proximity to MPD Officer M.F. and took steps to assist the officer from being further assaulted by members of the riot. Mazza did not make physical contact with MPD Officer Fanone, nor did he physically assist the officer in returning to the tunnel area.

17.     Mazza and F1 remained on the U.S. Capitol Grounds until flash bang grenades were deployed by law enforcement later that afternoon.

18.     After leaving the U.S. Capitol Grounds, defendant Mazza drove home to Indiana with F1. In his possession was the stolen baton. On January 8, 2021, Mazza, while in Indiana, filed a false police report with the Shelbyville Police Department ("SPD") in Indiana that falsely claimed that the Judge firearm was stolen out of his car on January 6, 2021, at a casino parking lot in the state of Ohio. Mazza made the initial report on January 8, 2021, by telephone. On January 13, 2021, Mazza later called the SPD back to provide the serial number for Judge revolver to complete the police report. This false stolen gun report was communicated to the United States

**Exhibit D-2 page 8**

Burau of Alcohol, Tobacco and Firearms ("ATF") in the District of Columbia and conveyed to USCP. Mazza made the false report to avoid being identified by law enforcement as having been involved in the events of January 6, 2021. Sometime after returning home, Mazza further used a hand-held rotary tool to remove the etched serial number markings from the stolen baton.

19.     In a consensual interview with U.S. Capitol Police special agents on March 25, 2021, outside his home, Mazza admitted that he attended the Stop the Steal rally, and that he came onto the U.S. Capitol Grounds with the loaded Judge revolver. Mazza stated that he lost the Judge firearm while in a crowd of people who were involved in violence against law enforcement inside the tunnel area on the West Front entrance to the U.S. Capitol, which was approximately 3:15 p.m. Mazza admitted to filing the false police report for the stolen firearm. Mazza also falsely stated to the agents that he although he observed violence against officers, he acted a peacemaker, and he did not commit any acts of violence against any law enforcement officers. Mazza also claimed to have helped one of the officers who got dragged into the crowd after he left the tunnel area.

### *Elements of the Offense*

20.     Mazza knowingly and voluntarily admits to all the elements of Title 18, United States Code, Sections 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon). Specifically, Mazza admits that he:

- forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with any person designated in 18 U.S.C. § 1114 while engaged in or on account of the performance of their official duties. Specifically, Mazza admits that he struck MPD Officer P.N. in the arm with a metal baton, a person who was a person assisting the United States Capitol Police, that is, an officer from the D.C. Metropolitan Police Department. The defendant further admits that he/she knew at that time of the assault the officer that the officer was engaged in the

**Exhibit D-2 page 9**

performance of their official duties or that he assaulted the officer on account of their performance of their official duties.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: _____
Tejpal S. Chawla
Assistant United States Attorney
D.C. Bar No. 464012

**Exhibit D-2 page 10**

## DEFENDANT'S ACKNOWLEDGMENT

I, **Mark Mazza**, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: _23 May 2022_ _____
**Mark Mazza**
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: _5/23/22_ _____
Gregory English, Esq.
Attorney for Defendant

Page **11** of **11**

**Exhibit D-2 page 11**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 22-cr-198 (JEB) |
| | : | |
| RODNEY KENNETH MILSTREED, | : | 18 U.S.C. § 111(a)(1) and (b) |
| | : | 18 U.S.C. § 113(a)(4) |
| Defendant. | : | 26 U.S.C. § 5861(d) |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, RODNEY KENNETH MILSTREED, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.   The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2.   On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3.   On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the U.S. House of Representatives and the U.S. Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of

**Exhibit D-2 page 13**

the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.     As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5.     At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6.     At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $2.7 million dollars for repairs.

**Exhibit D-2 page 14**

7.     Shortly thereafter, at approximately 2:20 p.m., members of the U.S. House of Representatives and U.S. Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### MILSTREED's Participation in the January 6, 2021, Capitol Riot

8.     Rodney Kenneth Milstreed, a resident of Maryland, planned to attend the rally on January 6, 2021. In advance of the event, he attempted to recruit friends to join him. He procured a wooden club. He injected steroids and worked out in an effort to get "jacked." He indicated he was prepared to "crack some skulls."

9.     On the morning of January 6, 2021, Milstreed took the train from his home in Maryland to Washington, D.C., and attended the "Stop the Steal" rally on the National Mall. He carried a wooden pick handle, approximately 4 feet long, with a blue "Trump" flag attached to it. Shortly before 1:00 pm, he made his way to the restricted grounds of the U.S. Capitol and was just behind the initial group of rioters who breached the police line at the Pennsylvania Avenue walkway. He made his way to the front of the crowd at the West Plaza barricade, where he broke through the police line. Shortly after 1:00 pm, Milstreed and a large group of rioters swarmed the

**Exhibit D-2 page 15**

Upper West Plaza and attempted to overcome a group of officers who had formed a makeshift police line in an effort to stop the rioters from advancing further toward the building.

10.     Between approximately 1:00 pm and 3:00 pm, Milstreed engaged with the crowd in an effort to break through the police barriers and approach the Capitol building. He reached the Upper West Terrace, within yards of the entrance to the Capitol itself. During the fighting, Milstreed grabbed and yanked on a bike rack barrier fence the U.S. Capitol Police were attempting to secure. Also during this time, Milstreed located a smoke grenade that had been deployed to disburse the crowd and threw it back into the police line. He took photos and videos with his phone, including recordings of himself shouting encouragement to the other rioters and obscenities to the police officers.

11.     While Milstreed was on the Upper West Plaza, shortly after 1:00 pm, he forcibly assaulted a group of U.S. Capitol Police officers by throwing his wooden pick handle, with the flag still attached, into the line of U.S. Capitol Police officers attempting to prevent the crowd from advancing. The pick handle hit a U.S. Capitol Police officer and glanced off the officer's helmet. At the time he threw the pick handle, Milstreed knew that the officers he targeted were engaged in the performance of their official duties to protect the Capitol building and the people working inside, and he targeted them for this very reason.

12.     While Milstreed was still on the Upper West Plaza, he took notice of an individual in the crowd who was dressed in black, wearing a helmet-style gas mask and a lanyard with Associated Press lettering, and carrying at least one large professional camera. This individual, who was a photographer for the Associated Press, came under attack by rioters in the area. Milstreed was one of the first to assault this individual, and in doing so he committed an act of striking, beating, or wounding the victim. Specifically, Milstreed grabbed on to the photographer's

**Exhibit D-2 page 16**

backpack and yanked him down a set of steps to the Lower West Plaza. After the victim stumbled to the bottom of the stairs, Milstreed shoved him and advanced toward him in a threatening fashion. Additional rioters surrounded the victim and continued the assault, dragging him through the crowd, grabbing his media identification lanyard, and grabbing his face and neck.

13.     After the riot, Milstreed sent messages to friends celebrating his participation in the riot and his assaults on law enforcement and members of the media. Around 8:00 pm that evening, Milstreed told one friend, "We fucked them federal cops up. They all ran when we got physical. LMFAO[.]" He then added, "Time for war." Approximately two days later, on January 8, 2021, he told another friend, "I did get to punch a camera man with everything I had brother I felt good." To another friend, three days after the riot, Milstreed stated, "When I went to DC I didn't go there to be peaceful. In dont think most us wanted any damage. We want to get our hands on the politicians. We want to drag them in the street and put the fear of God in their soul. 💯FACT."

14.     In the weeks Milstreed prepared for the violent events at the Capitol on January 6, 2021—including procuring and displaying weapons and ammunition, drug use and physical training, and recruiting of like-minded supporters—and in his violent acts during the riot itself, Milstreed's conduct was calculated and designed to influence and affect the conduct of government and to retaliate against government conduct. In particular, Milstreed intended to stop the politicians in Congress from certifying the results of the 2020 Presidential election through intimidation and coercion. As one example, in November and December, he sent photos of the firearms collection he kept at his home in Maryland to associates on Facebook and suggested he would use his assault rifles to help ensure then-President Trump stayed in power. Making reference to his firearms and referring to the politicians in Congress, Milstreed wrote, "Think we're just gonna let them have it. Over alot of dead bodies… I see war either way[,]" and "We will fuck

**Exhibit D-2 page 17**

these punks up[.]"  Milstreed did not bring firearms or ammunition to the Capitol on January 6, 2021.

      15.    The firearms, ammunition, and other items referred to in the previous paragraph included, but are not limited to the following:

a. Item # 2 - Unopened Ammo Box Labeled Wolf Military Classic
b. Item # 3 - Upper Receiver for AR Style Weapon; No Bolt Carrier Group
c. Item # 4 - Upper Receiver for AR Style Weapon with Bolt Carrier Group
d. Item # 4a - AR Style Weapon Scope Attached to Item # 4
e. Item # 4b - Suppressor Attached to Item #4
f. Item # 5 - Upper Receiver for AR Style Weapon; No Bolt Carrier Group
g. Item # 5a - Optic Mounted to Item # 5
h. Item # 5b - Suppressor Attached to Item # 5
i. Item # 6 - AR Style Weapon Scope, Black In Color ; Bearing 4-16x50aoeg
j. Item # 7 - Aluminum Type, Improvised Suppressor (Black in Color) With Inscription 'D2037963705'
k. Item # 8 - AR Style Weapon; No Bolt Carrier Group
l. Item # 8a - AR Style Weapon Scope 'Micro3x' Attached To Item #8
m. Item # 8b - AR Style Weapon Scope 'Strikeforce' Attached To Item #8
n. Item # 9 - Lower Receiver, Black in Color, for AR Style Weapon
o. Item # 10 - Lower Receiver for AR Style Weapon, Black in Color, with Coating, Silver in Color
p. Item # 11 - Buffer Spring, Black in Color
q. Item # 12 - Upper Receiver for AR Style Weapon, No Bolt Carrier Group
r. Item # 13 - Unopened Box Labeled "Federal Ammunition .223 X 1000"
s. Item # 14 - Remington Box Containing an Empty Magazine, 4 Shell Casings, 2 Live Rounds
t. Item # 15 - Opened Ammo Box Labeled "UMC Bulk Pack" Containing Approximately (471) .223 Rounds
u. Item # 16 - Box Containing (19) X 223. Rounds (20 Boxes), X 1 Winchester 556 (20 Rd Box)
v. Item # 17 - Metal Ammo Box Partially Opened Containing Boxes of "Wolf Military Classic" .223 Rounds.
w. Item # 19 - Buffer Spring, Black in Color
x. Item # 21 - 11 Magazines Total: 9 X 5.56, 2 X 7.62, 7 X 30 Round Capacity, (1) Empty, (1) With (2) Rounds, (3) With 30 Rounds, (2) With 31 Rounds, 2 40 Round Capacity, (1) With 10 Rounds, (1) With 11 Rounds, Additional 3 Loose Rounds

16.    Milstreed kept his assortment of firearms, which included assault rifles and boxes of ammunition, long after January 6, 2021.  One of the firearms Milstreed maintained in his possession, which FBI agents located at his home in Finksburg, Maryland on May 24, 2022, was a .300 Blackout caliber rifle (AR 15-variant) with a barrel length of 10.19 inches that was a privately made firearm with an upper receiver manufactured by Aero Precision and a lower receiver with a manufacturer that could not be determined.  This firearm was not registered to Milstreed in the National Firearms Registration and Transfer Record as required.  In addition, Milstreed maintained in his possession two lower receivers and three upper receivers, all without serial numbers; three suppressors, including one that appeared to be hand-made; four assault rifle-style scopes, only one of which had a serial number; a mounted weapon optic; two buffer springs; approximately 2,000 to 2,500 rounds of ammunition; and 11 rifle-style magazines.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _____
EMILY W. ALLEN
Assistant United States Attorney
Cal. Bar No. 234961

Page 7 of 8

**Exhibit D-2 page 19**

## DEFENDANT'S ACKNOWLEDGMENT

I, RODNEY KENNETH MILSTREED, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: _March 27, 2023_ _____
Rodney Kenneth Milstreed
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: April 4, 2023 _____

David Benowitz
Rammy Barbari
Attorneys for Defendant

**Exhibit D-2 page 20**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO.: 22-CR-381** |
| **v.** | : | |
| | : | **18 U.S.C. § 111(a)(1) and (b) (Assaulting,** |
| **JACOB MICHAEL THERRES,** | : | **Resisting, or Impeding Certain Officers** |
| | : | **Using a Dangerous Weapon)** |
| **Defendant.** | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, JACOB MICHAEL THERRES, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### The Attack at the U.S. Capitol on January 6, 2021

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

1

**Exhibit D-2 page 21**

3.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol;

**Exhibit D-2 page 22**

however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### THERRES's Participation in the January 6, 2021 Capitol Riot

8.      On January 6, 2021, THERRES traveled from his residence in Belcamp, Maryland to Washington, D.C. to attend the "Stop the Steal" rally and election-related events occurring on January 6, 2021. The purpose of THERRES's trip to Washington, D.C., was to attend the "Stop the Steal Rally" so he could see and hear President Trump's speech.

9.      On January 6, 2021, THERRES attended the rally in Washington, D.C. and later walked to the U.S. Capitol complex. THERRES was wearing a blue Trump hat, a red hooded

**Exhibit D-2 page 23**

sweatshirt with a black, blue and green backpack, light-colored pants, tennis shoes, and sometimes wearing a white mask.

10.     When THERRES arrived at the U.S. Capitol on January 6, 2021 at approximately 1:30 p.m., a large crowd had assembled on the restricted grounds surrounding the U.S. Capitol building. THERRES observed that law enforcement officer were actively attempting to keep the crowd away from the building, indicating that the building was closed to the public.

11.     At approximately 2:10 p.m., THERRES was near the front of a line of protestors up against of police line of federal law enforcement officers wearing riot gear on the West Plaza near the inaugural stage. THERRES was standing in close proximity to his stepfather, Douglas Steven Wyatt, who was yelling at the officers in the police line. At around 2:10 p.m., protestors began breaching the police line and engaging in physical altercations with officers. At this time, THERRES twice threw small objects that he picked up off the ground at the police line.

12.     At around 2:14 p.m., Wyatt picked up a long, 4"X4" wooden plank off the ground and handed it to THERRES, who took the wooden plank and threw it at the police line. The wooden plank thrown by THERRES struck the helmet of U.S. Capitol Police ("USCP") Officer J.W., who briefly lost consciousness after the impact. USCP Officer J.W. continued to experience concussion symptoms following January 6, 2021. At around 2:20 p.m., THERRES took a chemical spray gun from a black bag on the inaugural stage area on the West plaza and began spraying law enforcement officers from the inaugural stage.

### *Elements of the Offense*

13.     JACOB MICHAEL THERRES knowingly and voluntarily admits to all the elements of 18 U.S.C. § 111(a) and (b)(1). Specifically, defendant admits that

**Exhibit D-2 page 24**

- The defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with any person designated in 18 U.S.C. § 1114 while engaged in or on account of the performance of their official duties. Specifically, the defendant admits that he sprayed several MPD and Capitol Police officers with a chemical spray while those MPD officers were assisting the United States Capitol Police. The defendant further admits that he knew at that time of the assault of the officers that the officers were engaged in the performance of their official duties or that he assaulted the officers on account of their performance of their official duties.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Andrew J. Tessman
Andrew J. Tessman
Assistant United States Attorney

**Exhibit D-2 page 25**

## DEFENDANT'S ACKNOWLEDGMENT

I, JACOB MICHAEL THERRES, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 1/5/2022

Jacob Michael Therres
JACOB MICHAEL THERRES
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: Jan. 6, 2023

Nathan Silver, II
Attorney for Defendant

Page **6** of **6**

**Exhibit D-2 page 26**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Case No.: 22-CR-334 (JEB)** |
| | : | |
| v. | : | **18 U.S.C. §§ 111(a) – Assault on Officer** |
| | : | |
| MIKHAIL SLYE, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Mikhail Slye, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### The Attack at the U.S. Capitol on January 6, 2021

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020

Page **1** of **6**

**Exhibit D-2 page 27**

Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5.      At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

**Exhibit D-2 page 28**

7.    Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Mikhail Slye's Participation in the January 6, 2021, Capitol Riot*

8.    The defendant, Mikhail Slye, traveled to Washington, D.C. on January 6, 2021 to attend the "Stop the Steal" rally and election-related events occurring on January 6, 2021. After attending the rally, the defendant traveled by foot to the U.S. Capitol where a large crowd had gathered to protest Congress' certification of the Electoral College. The defendant was wearing a black "Trump" winter hat, a yellow gator partially covering his face at certain times, a dark navy winter jacket over the top of a gray hooded sweatshirt, blue jeans with a piece of paper sticking out the back pocket at certain times, black gloves, and occasionally wearing a dark-colored baseball helmet with a metal facemask.

9.    When the defendant arrived at the U.S. Capitol on January 6, 2021 at approximately 2:30 p.m. EST, a large crowd had assembled on the lower West terrace of the restricted grounds surrounding the U.S. Capitol building. The defendant observed that the building was closed to the

**Exhibit D-2 page 29**

public and law enforcement officers were actively attempting to keep the crowd from entering the building. The defendant unlawfully entered the U.S. Capitol building through the Senate Wing door area at approximately 2:56 p.m. EST and exited through the same area about three minutes later. The defendant then reentered the building through the Senate Wing door area at approximately 3:05 p.m. EST. While inside, the defendant walked around and went into to the crypt area of the U.S. Capitol. The defendant exited the building through the Senate Wing door area at approximately 3:35 p.m. EST.

10.     After exiting the building, the defendant walked around to the North side of the U.S. Capitol building, where the defendant observed a group of protestors clashing with law enforcement. There were a set of doors, known as the "North doors," on that side of the building. Officers were periodically exiting and entering through the North doors for crowd control purposes. The defendant observed that the officers were using rubber bullets, fire extinguishers, and mace for crowd control purposes.

11.     At approximately 4:14 p.m. EST, a group of officers, including an officer with the initials D.T., exited through the North doors and were about to descend a flight of stairs leading into the crowd of protestors where another officer holding a gun had been surrounded by protestors. The defendant was standing near the bottom of the stairs prior to the officers' descent. The defendant grabbed a bicycle rack, held onto it, and waited for the officers to come down the stairs. As the officers were coming down the stairs, the defendant threw the bike rack into the path of D.T., causing him to trip over the bike rack, fall over it, and fall down the stairs at the same time. D.T. suffered bodily injury, including injuries to his right hand, his shins, and a contusion to his right thumb.

**Exhibit D-2 page 30**

12.     Approximately one or two minutes after the tripping incident, the defendant began shouting at the officers, including D.T., attempting to reenter the building. As the officers were attempting to reenter the building and close the North doors behind them, the defendant called out, "traitor," "this is our country," "f*** you," "Nazis," and "f***ing bitches" as he spat from his mouth toward the officers while those officers were actively spraying the protestors, including the defendant, with mace and a fire extinguisher.

13.     Mikhail Slye knowingly and voluntarily admits to all the elements of 18 U.S.C. § 111(a). Specifically, defendant admits that

- The defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with any person designated in 18 U.S.C. § 1114 while engaged in or on account of the performance of their official duties. Specifically, the defendant admits that he knowingly and intentionally tripped United States Capitol Police Officer D.T. with a bike rack. The defendant further admits that he knew at that time of the assault of the officer that D.T. was engaged in the performance of his official duties or that he assaulted D.T. on account of their performance of their official duties.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:     *s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
WV Bar No. 13734

**Exhibit D-2 page 31**

## DEFENDANT'S ACKNOWLEDGMENT

I, Mikhail Slye, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 11/08/2022

MIKHAIL SLYE
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 11/8/2022

Michael van der Veen
Attorney for Defendant

Page **6** of **6**

Exhibit D-2 page 32

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                        |     |                                      |
| -------------------------------------- | --- | ------------------------------------ |
| **UNITED STATES OF AMERICA**           | :   | **Case No.: 21-CR-330 (JEB)**        |
|                                        | :   |                                      |
| **v.**                                 | :   | **18 U.S.C. § 231(a)(3)**            |
|                                        | :   | **18 U.S.C. § 111(a)(1)**            |
| **JONATHAN JOSHUA MUNAFO,**            | :   |                                      |
|                                        | :   |                                      |
| **Defendant.**                         | :   |                                      |
|                                        | :   |                                      |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Jonathan Joshua Munafo, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### The Attack at the U.S. Capitol on January 6, 2021

1.     The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.     On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3.     On January 6, 2021, a joint session of the United States Congress convened at the Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020

**Exhibit D-2 page 33**

Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.     Shortly thereafter, at approximately 2:20 p.m., members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. on January 6, 2021. Considering the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

8.     At approximately 2:28 p.m., in the West Plaza of the Capitol, rioters attacked law enforcement and attempted to breach the police line. Not long after the initial surge, rioters broke through the police line and overran the West Plaza. This mob turned violent and rioters attacked USCP with fists, fire extinguishers, and the "bike rack" style barricades. At approximately 2:36 p.m., some USCP focused their defense of the Capitol on the Arch Entrance/Inauguration Tunnel. For the next two-and-a-half hours, until approximately 5:10 PM, rioters continued attacking USCP and attempting to force their way inside.

*Jonathan Joshua Munafo's Participation in the January 6, 2021, Capitol Siege*

9.     In the months preceding the Capitol siege, the defendant, Jonathan Joshua Munafo, was traveling to various states and locations around the country. On the evening of January 5, 2021, Munafo was in North Carolina, driving towards Washington, D.C. On January 6, 2021,

**Exhibit D-2 page 35**

Munafo arrived in Washington, D.C. The purpose of the Munafo's trip to Washington, D.C., was to support former President Donald Trump.

10. On January 6, 2021, at approximately 3:21 p.m., USCP officer Michael Fanone—who had been pulled from behind the police line in the Inauguration Tunnel and out into the rioters—made his way back behind the police line. MPD officer Neil McAllister was then using a USCP riot shield to keep the rioters back and allow Officer Fanone safe passage back behind the police line, of which he was a part. Approximately ten seconds after Officer Fanone passed by on Officer McAllister's right, an unidentified individual wearing a beige jacket pulled the top of Officer McAllister's riot shield down, but Officer McAllister was still holding on to the handles. Seconds later, Munafo emerged from the crowd of rioters and punched Officer McAllister twice with a closed fist. The two punches landed on the body and face shield of Officer McAllister, who was at the time wearing full protective gear and does not recall experiencing any pain or injury as a direct result of Munafo's actions at that moment. Munafo then grabbed one of the handles of Officer McAllister's riot shield and pulled the riot shield away out of Officer McAllister's hands. Munafo then retreated into the crowd with the stolen riot shield.

11. At another time on the Lower West Terrace on January 6, 2021, another unidentified individual handed Munafo a wooden flagpole with a flag attached. Munafo then struck a window of the Capitol thirteen times with the flagpole.

### Elements of the Offense

12. Jonathan Joshua Munafo knowingly and voluntarily admits to all the elements of 18 U.S.C. § 231(a)(3), specifically,

- First, Munafo admits that he knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers;

**Exhibit D-2 page 36**

- Second, Munafo admits that at the time of his actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder; and

- Third, Munafo admits that the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

13.   Jonathan Joshua Munafo knowingly and voluntarily admits to all the elements of

18 U.S.C. § 111(a)(1), specifically,

- First, Munafo admits that he assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer Neil McAllister, an officer from the Metropolitan Police Department;

- Second, Munafo admits that he did such acts forcibly;

- Third, Munafo admits that he did such acts voluntarily and intentionally;

- Fourth, Munafo admits that he assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer of the United States who was assisting officers of the United States who were then engaged in the performance of their official duties; and

- Fifth, Munafo admits that he made physical contact with and assaulted a person who was assisting officers of the United States who were then engaged in the performance of their official duties.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   _____
Sean P. Murphy
Assistant United States Attorney
D.C. Bar No. 1187821

**Exhibit D-2 page 37**

## DEFENDANT'S ACKNOWLEDGMENT

I, Jonathan Joshua Munafo, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 04/20/2023

Jonathan Joshua Munafo
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4/20/23

Kevin Lerman
Attorney for Defendant

Joseph Niskar
Attorney for Defendant

**Exhibit D-2 page 38**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 22-cr-198 (JEB) |
| | : | |
| RODNEY KENNETH MILSTREED, | : | 18 U.S.C. § 111(a)(1) and (b) |
| | : | 18 U.S.C. § 113(a)(4) |
| Defendant. | : | 26 U.S.C. § 5861(d) |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, RODNEY KENNETH MILSTREED, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### The Attack at the U.S. Capitol on January 6, 2021

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the U.S. House of Representatives and the U.S. Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of

Page 1 of 8

**Exhibit D-2 page 39**

the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $2.7 million dollars for repairs.

**Exhibit D-2 page 40**

7.      Shortly thereafter, at approximately 2:20 p.m., members of the U.S. House of Representatives and U.S. Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *MILSTREED's Participation in the January 6, 2021, Capitol Riot*

8.      Rodney Kenneth Milstreed, a resident of Maryland, planned to attend the rally on January 6, 2021. In advance of the event, he attempted to recruit friends to join him. He procured a wooden club. He injected steroids and worked out in an effort to get "jacked." He indicated he was prepared to "crack some skulls."

9.      On the morning of January 6, 2021, Milstreed took the train from his home in Maryland to Washington, D.C., and attended the "Stop the Steal" rally on the National Mall. He carried a wooden pick handle, approximately 4 feet long, with a blue "Trump" flag attached to it. Shortly before 1:00 pm, he made his way to the restricted grounds of the U.S. Capitol and was just behind the initial group of rioters who breached the police line at the Pennsylvania Avenue walkway. He made his way to the front of the crowd at the West Plaza barricade, where he broke through the police line. Shortly after 1:00 pm, Milstreed and a large group of rioters swarmed the

**Exhibit D-2 page 41**

Upper West Plaza and attempted to overcome a group of officers who had formed a makeshift police line in an effort to stop the rioters from advancing further toward the building.

10.     Between approximately 1:00 pm and 3:00 pm, Milstreed engaged with the crowd in an effort to break through the police barriers and approach the Capitol building. He reached the Upper West Terrace, within yards of the entrance to the Capitol itself. During the fighting, Milstreed grabbed and yanked on a bike rack barrier fence the U.S. Capitol Police were attempting to secure. Also during this time, Milstreed located a smoke grenade that had been deployed to disburse the crowd and threw it back into the police line. He took photos and videos with his phone, including recordings of himself shouting encouragement to the other rioters and obscenities to the police officers.

11.     While Milstreed was on the Upper West Plaza, shortly after 1:00 pm, he forcibly assaulted a group of U.S. Capitol Police officers by throwing his wooden pick handle, with the flag still attached, into the line of U.S. Capitol Police officers attempting to prevent the crowd from advancing. The pick handle hit a U.S. Capitol Police officer and glanced off the officer's helmet. At the time he threw the pick handle, Milstreed knew that the officers he targeted were engaged in the performance of their official duties to protect the Capitol building and the people working inside, and he targeted them for this very reason.

12.     While Milstreed was still on the Upper West Plaza, he took notice of an individual in the crowd who was dressed in black, wearing a helmet-style gas mask and a lanyard with Associated Press lettering, and carrying at least one large professional camera. This individual, who was a photographer for the Associated Press, came under attack by rioters in the area. Milstreed was one of the first to assault this individual, and in doing so he committed an act of striking, beating, or wounding the victim. Specifically, Milstreed grabbed on to the photographer's

**Exhibit D-2 page 42**

backpack and yanked him down a set of steps to the Lower West Plaza. After the victim stumbled to the bottom of the stairs, Milstreed shoved him and advanced toward him in a threatening fashion. Additional rioters surrounded the victim and continued the assault, dragging him through the crowd, grabbing his media identification lanyard, and grabbing his face and neck.

13.   After the riot, Milstreed sent messages to friends celebrating his participation in the riot and his assaults on law enforcement and members of the media. Around 8:00 pm that evening, Milstreed told one friend, "We fucked them federal cops up. They all ran when we got physical. LMFAO[.]" He then added, "Time for war." Approximately two days later, on January 8, 2021, he told another friend, "I did get to punch a camera man with everything I had brother I felt good." To another friend, three days after the riot, Milstreed stated, "When I went to DC I didn't go there to be peaceful. In dont think most us wanted any damage. We want to get our hands on the politicians. We want to drag them in the street and put the fear of God in their soul. 💯FACT."

14.   In the weeks Milstreed prepared for the violent events at the Capitol on January 6, 2021—including procuring and displaying weapons and ammunition, drug use and physical training, and recruiting of like-minded supporters—and in his violent acts during the riot itself, Milstreed's conduct was calculated and designed to influence and affect the conduct of government and to retaliate against government conduct. In particular, Milstreed intended to stop the politicians in Congress from certifying the results of the 2020 Presidential election through intimidation and coercion. As one example, in November and December, he sent photos of the firearms collection he kept at his home in Maryland to associates on Facebook and suggested he would use his assault rifles to help ensure then-President Trump stayed in power. Making reference to his firearms and referring to the politicians in Congress, Milstreed wrote, "Think we're just gonna let them have it. Over alot of dead bodies… I see war either way[,]" and "We will fuck

**Exhibit D-2 page 43**

these punks up[.]" Milstreed did not bring firearms or ammunition to the Capitol on January 6, 2021.

15.    The firearms, ammunition, and other items referred to in the previous paragraph included, but are not limited to the following:

a. Item # 2 - Unopened Ammo Box Labeled Wolf Military Classic
b. Item # 3 - Upper Receiver for AR Style Weapon; No Bolt Carrier Group
c. Item # 4 - Upper Receiver for AR Style Weapon with Bolt Carrier Group
d. Item # 4a - AR Style Weapon Scope Attached to Item # 4
e. Item # 4b - Suppressor Attached to Item #4
f. Item # 5 - Upper Receiver for AR Style Weapon; No Bolt Carrier Group
g. Item # 5a - Optic Mounted to Item # 5
h. Item # 5b - Suppressor Attached to Item # 5
i. Item # 6 - AR Style Weapon Scope, Black In Color ; Bearing 4-16x50aoeg
j. Item # 7 - Aluminum Type, Improvised Suppressor (Black in Color) With Inscription 'D2037963705'
k. Item # 8 - AR Style Weapon; No Bolt Carrier Group
l. Item # 8a - AR Style Weapon Scope 'Micro3x' Attached To Item #8
m. Item # 8b - AR Style Weapon Scope 'Strikeforce' Attached To Item #8
n. Item # 9 - Lower Receiver, Black in Color, for AR Style Weapon
o. Item # 10 - Lower Receiver for AR Style Weapon, Black in Color, with Coating, Silver in Color
p. Item # 11 - Buffer Spring, Black in Color
q. Item # 12 - Upper Receiver for AR Style Weapon, No Bolt Carrier Group
r. Item # 13 - Unopened Box Labeled "Federal Ammunition .223 X 1000"
s. Item # 14 - Remington Box Containing an Empty Magazine, 4 Shell Casings, 2 Live Rounds
t. Item # 15 - Opened Ammo Box Labeled "UMC Bulk Pack" Containing Approximately (471) .223 Rounds
u. Item # 16 - Box Containing (19) X 223. Rounds (20 Boxes), X 1 Winchester 556 (20 Rd Box)
v. Item # 17 - Metal Ammo Box Partially Opened Containing Boxes of "Wolf Military Classic" .223 Rounds.
w. Item # 19 - Buffer Spring, Black in Color
x. Item # 21 - 11 Magazines Total: 9 X 5.56, 2 X 7.62, 7 X 30 Round Capacity, (1) Empty, (1) With (2) Rounds, (3) With 30 Rounds, (2) With 31 Rounds, 2 40 Round Capacity, (1) With 10 Rounds, (1) With 11 Rounds, Additional 3 Loose Rounds

**Exhibit D-2 page 44**

16.     Milstreed kept his assortment of firearms, which included assault rifles and boxes of ammunition, long after January 6, 2021.  One of the firearms Milstreed maintained in his possession, which FBI agents located at his home in Finksburg, Maryland on May 24, 2022, was a .300 Blackout caliber rifle (AR 15-variant) with a barrel length of 10.19 inches that was a privately made firearm with an upper receiver manufactured by Aero Precision and a lower receiver with a manufacturer that could not be determined.  This firearm was not registered to Milstreed in the National Firearms Registration and Transfer Record as required.  In addition, Milstreed maintained in his possession two lower receivers and three upper receivers, all without serial numbers; three suppressors, including one that appeared to be hand-made; four assault rifle-style scopes, only one of which had a serial number; a mounted weapon optic; two buffer springs; approximately 2,000 to 2,500 rounds of ammunition; and 11 rifle-style magazines.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

EMILY W. ALLEN
Assistant United States Attorney
Cal. Bar No. 234961

**Exhibit D-2 page 45**

## DEFENDANT'S ACKNOWLEDGMENT

I, RODNEY KENNETH MILSTREED, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: March 27, 2023

Rodney Kenneth Milstreed
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: April 4, 2023

David Benowitz
Rammy Barbari
Attorneys for Defendant

**Exhibit D-2 page 46**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.: 22-cr-00350 |
| | : | |
| v. | : | 18 U.S.C. § 111(a)(1) |
| | : | |
| JUSTIN DEE ADAMS, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, JUSTIN DEE ADAMS, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### The Attack at the U.S. Capitol on January 6, 2021

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020

**Exhibit D-2 page 47**

Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5.      At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *JUSTIN DEE ADAMS's Participation in the January 6, 2021, Capitol Riot*

8.      The defendant, JUSTIN DEE ADAMS, lives in West Jordan, Utah. On or about January 5, 2021, the defendant traveled from Utah to Washington, D.C., via automobile. The purpose of the defendant's trip to Washington, D.C., was to protest Congress' certification of the Electoral College.

9.      On January 6, the defendant attended the "Stop the Steal" rally and then marched with other protestors to the Capitol.

10.     At about 2:00 p.m., the defendant was part of a mob on the Upper West Plaza of the Capitol that was engaged in civil disorder. Officers from the U.S. Capitol Police and the Metropolitan Police Department (MPD) lawfully attempted to maintain a police line to prevent the mob from advancing further into the restricted area of the Capitol.

**Exhibit D-2 page 49**

11.     At approximately 2:04 p.m., the defendant moved to the front of the mob and walked toward the police line.  The defendant raised his hands above his head and walked toward police officers until he made physical contact with one or more officers.  He was subsequently pushed back several feet.

12.     The defendant then charged at the police line and attacked one or more MPD officers.  The defendant used his hands to strike a MPD officer, who was wearing a helmet, twice in the head.

13.     At approximately 2:13 p.m., the defendant grabbed a metal bicycle rack that police officers were using as a barricade to prevent rioters from advancing further into the restricted areas of the Capitol.  A police officer attempted to prevent the defendant from removing the bike rack. The defendant threw a plastic bottle at the police officer.  The defendant and another rioter pulled the bike rack away from the police and dragged it into the crowd.

### *Elements of the Offense*

14.     JUSTIN DEE ADAMS knowingly and voluntarily admits to all the elements of 18 U.S.C. § 111(a)(1).  Specifically, defendant admits that he assaulted, resisted, opposed, impeded, intimidated, and interfered with an officer or employee of the United States or of any agency in any branch of the United States Government; he did so with some use of force; he did so while the officer or employee was engaged in or on account of the performance of official duties; and the assault involved physical contact with the victim or the intent to commit another felony.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: _____

Brian Morgan
Trial Attorney
NY Bar No. 4276804

Exhibit D-2 page 51

## DEFENDANT'S ACKNOWLEDGMENT

I, JUSTIN DEE ADAMS, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 3/14/2023

JUSTIN DEE ADAMS
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 3/24/23

JERRY SMITH
Attorney for Defendant

Page **6** of **6**

Case: 1:22-mj-00264
Assigned To : Faruqui, Zia M.
Assign. Date : 12/2/2022
Description: Complaint W/ Arrest Warrant

## STATEMENT OF FACTS

I, the affiant, Andrew Martin, am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since July 2018. My duties, responsibilities, and training as a Special Agent with the FBI include investigating violations of federal law. I have been involved in the execution of search and arrest warrants. I am assigned to the FBI's Joint Terrorism Task Force (JTTF) and have experience investigating national security threats, to include international terrorism and domestic terrorism. I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

1

**Exhibit D-2 page 53**

### Facts Specific to this Case

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of hundreds of individuals inside the U.S. Capitol building without authority to be there, in violation of federal laws. Photographs and videos of several of these persons were disseminated via social media and other open-source online platforms and were also highlighted by the FBI on its public website as persons of interest. Those persons included a male wearing a gray t-shirt, dark brown leather jacket, and—at times—a black beanie with the logo "I ♥ TRUMP." A FBI bulletin seeking information about this individual, among others, is shown below; in the photograph, the individual (circled in yellow) is not wearing the beanie.



*FBI BOLO 175 and 175*

Law enforcement has determined that there is probable cause to believe that this individual is ISRAEL JAMES EASTERDAY ("EASTERDAY"), based on, among other things, an identification provided by a law enforcement officer in Kentucky who has observed EASTERDAY personally and viewed photographs of the individual from the U.S. Capitol building and grounds on January 6, 2021, as described further below.

Information obtained about EASTERDAY in relation to the riot at the U.S. Capitol on January 6, 2021, includes the following: In an approximately nine minute long clip from publicly available video viewed by the affiant ("YouTube Video 1"), EASTERDAY is shown with a group of rioters outside the East Rotunda door from approximately 2:17 pm to 2:26 pm.[1]

---

[1]    This video clip was introduced as Government Exhibit 512.01 at trial in *United States v. John Strand*, 21 Cr. 85 (D.D.C.).

**Exhibit D-2 page 54**

YouTube Video 1 does not contain time stamps but the time in YouTube Video 1 can be approximated because it shows the breach of the East Rotunda door at the end of the clip, and I know from time-stamped CCTV video that this breach occurred at approximately 2:26 pm.

In the scene shown in YouTube Video 1, a large group of rioters were congregated outside the East Rotunda door, and some of the rioters had broken its windows using, among other things, flag poles to smash the glass. USCP Officer 1 and other police officers were trying to prevent the rioters from breaching the door and entering the Capitol Building. In a still image taken from YouTube Video 1, EASTERDAY (circled in yellow) is shown in Image 1 below wearing a black beanie, carrying a confederate flag and participating with the group of rioters trying to enter the East Rotunda door:



*Image 1*

As shown in YouTube Video 1, EASTERDAY approached a group of police officers, including USCP Officer 1, and appeared to put down the confederate flag. A moment later, EASTERDAY (circled in yellow) pointed what appears to be some sort of bottle at USCP Officer 1 (circled in blue) and sprayed him with what appears to be a chemical irritant (circled in red), as shown in Image 2 below.

3

**Exhibit D-2 page 55**



*Image 2*

USCP Officer 1 has described to law enforcement, in sum and substance, that he believed he was sprayed with mace; that the irritant that sprayed him was different from the pepper spray used by the United States Capitol Police; that the irritant got in his eyes and caused him pain. Image 3 below, captured approximately two seconds after Image 2 above, shows USCP Officer 1 (circled in blue) turning away from EASTERDAY in reaction to being sprayed.



*Image 3*

USCP Officer 1 has viewed YouTube Video 1 and stated that the incident in which he recalls being assaulted with a chemical irritant by a rioter outside the East Rotunda door on January 6 is the incident shown on YouTube Video 1 described above.

Further, based on my training and experience and the experience of other officers, I know that chemical irritants such as mace, oleoresin capsicum spray (known as "OC spray") and others, are decapacitating, and they have a high potential to negatively affect an officer's ability to perform their official duties.

4

**Exhibit D-2 page 56**

On April 21, 2022, FBI Bowling Green Resident Agency (BGRA) was notified by the FBI Washington Field Office (WFO) of a previously unidentified subject believed to be EASTERDAY. WFO believed the subject to be EASTERDAY based on, among other things, information showing that a Google account associated with EASTERDAY was located inside or near the U.S. Capitol Building on January 6, 2021. Specifically, FBI submitted EASTERDAY's identifiers to the FBI's "geofence" database, which contains data of cellular activity around the U.S. Capitol Building during the riot on January 6, 2021. The geofence database returned positive results for a Google ID number ending in 2668, and further showed that this Google ID number is associated with EASTERDAY's name and a billing address that matches the address on EASTERDAY's Kentucky driver's license. Law enforcement also compared EASTERDAY's Kentucky driver's license photo to images of EASTERDAY from the U.S. Capitol and it appears that they show the same person.

FBI used analytical tools and searched publicly available materials to obtain Images 4 and 5 below, in which the individual believed to be EASTERDAY is wearing the same hat as the individual believed to be EASTERDAY shown in the videos of January 6 and similarly holding a confederate flag: [2]





*Image 4*

*Image 5*

FBI obtained additional photos and video that matched EASTERDAY from a database of photos and videos related to the riots that occurred at the Capitol on January 6, 2021. This information showed the individual believed to be EASTERDAY inside the U.S. Capitol among other rioters during the riot on January 6, 2021, both at times when he was wearing his black "I ♥ TRUMP" hat and when he was not.

---

[2]     Image 4 is an image made by magnifying the subject's face as shown in Image 5.

Images 6, 7 and 8 below are from CCTV video that identifies EASTERDAY's time and location within the Capitol. Image 6 shows EASTERDAY entering the U.S. Capitol through the East Rotunda Door at approximately 2:39 p.m., within approximately 13 minutes of the initial breach of the East Rotunda door.



*Image 6*

Image 7 shows EASTERDAY, a few seconds later, pulling other rioters into the U.S. Capitol through the door:



*Image 7*

6

Image 8 below shows EASTERDAY a few minutes later, at approximately 2:41 p.m., entering an area of the Capitol Building known as the Gallery Stairs.



*Image 8*

Additional images show EASTERDAY both inside and outside the U.S. Capitol:





*Image 9*



*Image 10*

7



*Image 11*

After being in the Gallery Stairs area of the U.S. Capitol at approximately 2:42 p.m. as shown in Image 11, EASTERDAY returned downstairs to the area from which he entered. CCTV video shows EASTERDAY approaching the East Rotunda door to exit the U.S. Capitol at approximately 2:51 p.m.

On April 25, 2022, your affiant interviewed a law enforcement officer at the Hart County Sheriff's Office in Munfordville, Kentucky ("HCSO Officer 1"). Hart County, Kentucky is the county where EASTERDAY's address is listed in Kentucky Department of Motor Vehicles records. Images 4, 5, 9, 10, and 11 were presented to HCSO Officer 1 for the purpose of identification. HCSO Officer 1 was presented the photos with no name associated and asked if the individual or individuals in the photos were known to the officer. HSCO Officer 1 immediately identified EASTERDAY as the subject in all photos. HCSO Officer 1 informed your affiant that he or she is personally familiar with EASTERDAY.

Based on the foregoing, I submit that there is probable cause to believe that EASTERDAY violated 18 U.S.C. §§111(a)(1), (b), and 2, which make it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with certain designated individuals, and to use a deadly or dangerous weapon or inflict bodily injury during the commission of such acts, or to aid, abet, counsel, command, induce, or procure the commission of such offenses. Within the meaning of this statute, a designated individual is an officer or employee of the United States or of any agency in a branch of the United States Government (including any member of the uniformed services), while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer in the performance of official duties or on account of that assistance.

I submit that there is also probable cause to believe that EASTERDAY violated 18 U.S.C. §§ 231(a)(3) and 2, which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the

8

**Exhibit D-2 page 60**

movement of any article or commodity in commerce or the conduct or performance of any federally protected function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes.

I further submit that there is probable cause to believe that EASTERDAY violated 18 U.S.C. §§ 1752(a)(1), (2), and (4), (b)(1)(A), and 2, which make it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; or attempts or conspires to do so; (4) knowingly engage in any act of physical violence against any person or property in any restricted building or grounds; or attempt or conspire to do so; and (b)(1)(A) to commit any of the aforementioned offenses with a deadly or dangerous weapon or firearm; or to aid, abet, counsel, command, induce, or procure the commission of such offenses. For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Finally, I submit that there also is probable cause to believe that EASTERDAY violated 40 U.S.C. §§ 5104(e)(2)(D) and (F), which makes it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (F) engage in any act of physical violence in the Grounds or any of the Capitol Buildings.

Special Agent Andrew Martin
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this __2nd__ day of December 2022.

2022.12.02
17:39:22
-05'00'

THE HONORABLE ZIA M. FARUQUI
U.S. MAGISTRATE JUDGE

9

**Exhibit D-2 page 61**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Case No.: 24-CR-00093 (JEB)** |
|  | : |  |
| v. | : | **18 U.S.C. § 111(a)(1)** |
|  | : |  |
| GREGORY YETMAN, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Gregory Yetman ("Yetman" and "the defendant"), with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

**Exhibit D-2 page 63**

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5.      At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.   At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7.   Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

*The Defendant's Participation in the January 6, 2021, Capitol Riot*

8.   Gregory Yetman, a heavy equipment operator living in New Jersey, drove to the vicinity of Washington, D.C., on January 6, 2021.  At that time, he was also an enlisted military police officer with the U. S. Army National Guard.  He parked near the Franconia-Springfield Metro station and rode the Metro to the Smithsonian station, arriving at approximately 7:30 a.m.

**Exhibit D-2 page 65**

Case 1:21-cr-00352-JEB   Document 107-2   Filed 11/15/24   Page 66 of 70
Case 1:24-cr-00093-JEB   Document 22   Filed 04/23/24   Page 4 of 8

Yetman listened to the various speeches at the rally for then-President Trump at the Ellipse and understood that then-President Trump state that they were going to go to the U.S. Capitol.

9.      Yetman then walked to the west side of U.S. Capitol building, where he heard people chanting, "Stop the Steal." While there, he heard "flash bangs" and observed tear gas being deployed by U.S. Capitol police officers who were defending the Capitol. He observed rioters who had been exposed to gas and oleoresin capsicum ("OC") spray and watched as other rioters attempted to break windows. He also saw a police officer get pulled into the crowd but did not attempt to help the officer.

10.      The riotous mob eventually overran the outnumbered police officers defending the west side of the Capitol. As it did so, Yetman climbed up to the platform on the West Terrace and was among the rioters encircling remaining police officers who continued to attempt to defend the federal Capitol building during the civil disorder. An isolated group of officers (who were visibly wearing police uniforms) struggled with the riotous mob but were quickly surrounded and assaulted from all sides. At approximately 2:29 p.m., as other rioters continued to assault those officers, Yetman picked up an MK-46H cannister containing OC spray (a lachrymatory agent capable of causing serious bodily injury), held the cannister under his arm, and, from within the effective distance of the spray, intentionally assaulted the same group of besieged police officers by spraying them with the OC spray. After Yetman sprayed multiple officers for approximately 12-14 seconds, the officers retreated towards other officers and left the area. The defendant discarded the MK-46H cannister on the platform. As he retraced his steps, Yetman held up a cellular telephone to take photographs and videos of the riotous mob. Shortly thereafter, Yetman walked up to the Lower West Terrace where rioters were attempting to make entry into the U.S. Capitol building through a heavily defended tunnel.

Page **4** of **8**

**Exhibit D-2 page 66**

11.    On and shortly after January 6, the defendant made a series of posts on Facebook describing his conduct at the U.S. Capitol. Among his posts, Yetman stated that "[w]hat happened at the Capitol was unfortunate and unacceptable, I was there I witnesses it" but blamed Antifa for starting the violence ("I can attest to Antifa members infiltrating our protest and meshing in with the Trump supporters . . . They riled up Trump supporters and got the violence going."). In one post, he acknowledged that the police officers defending the U.S. Capitol were "there to do their job," but wrote in another:

> I was there...we were gathering and they started lobbing oc at us. people got posed and rightly so. it was sad to see what our country has come to but being peaceful and the "nice guys" got us nowhere. this won't go away...the people have been wronged and we want justice and fairness. nobody went there to hurt law enforcement... but they sure as fuck hurt many people in return. they were relentless and i don't think i'll be backing the blue after this. they are modern brown shirts.

12.    In January 2021, FBI agents interviewed Yetman. Among other statements, Yetman insisted that he supports law enforcement and that anyone who entered the Capitol or assaulted an officer should be prosecuted.

13.    Federal investigators attempted to arrest Yetman for his conduct on January 6 on November 8, 2023. As soon as he saw the officers, however, Yetman first attempted to re-enter his residence and, when unable to do so, fled into the woods on foot. He dropped a knife and a cellular telephone; investigators subsequently located multiple firearms and significant quantities of ammunition in his residence, a loaded firearm in his vehicle, and additional firearms and weapons in a storage unit. After an extensive manhunt that lasted several days, Yetman turned himself into local police officers on November 10, 2023.

## Elements of the Offense

14.     The parties agree that Assaulting, Resisting, or Impeding Certain Officers or Employees in violation of 18 U.S.C. § 111(a)(1) requires the following elements:

   a. First, that the defendant assaulted officers from the Metropolitan Police Department;

   b. Second, the defendant did such acts forcibly;

   c. Third, the defendant did such acts voluntarily and intentionally;

   d. Fourth, the officers assaulted were assisting officers of the United States who were then engaged in the performance of their official duties; and

   e. Fifth, the defendant made physical contact with the officers or acted with the intent to commit another felony, namely, obstructing officers during a civil disorder in violation of 18 U.S.C. § 231(a)(3).

## Defendant's Acknowledgments

15.     The defendant knowingly and voluntarily admits to all the elements as set forth above. Specifically, the defendant admits that that he forcibly, knowingly, and intentionally assaulted police officers; that those officers were assisting officers of the United States who were engaged in the performance of their official duties at the time of that assault; that the defendant made physical contact with those officers; and that the defendant acted with the intent of obstructing and impeding those officers while they were engaged in the lawful performance of their duties during a civil disorder that both obstructed commerce and the performance of a federally protected function. The defendant further admits that he used a dangerous weapon during the assault on the police officers, and that the assault on the police officers was motivated by their status as government employees.

**Exhibit D-2 page 68**

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     *s/ Craig Estes*
        CRAIG ESTES
        Assistant U.S. Attorney
        Mass. BBO # 670370
        Capitol Siege Section
        U.S. Attorney's Office
        District of Columbia (Detailee)
        Telephone No: 617.748.3100
        Email Address: craig.estes@usdoj.gov

**Exhibit D-2 page 69**

## DEFENDANT'S ACKNOWLEDGMENT

I, Gregory Yetman, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 3/28/24                        /s/ Gregory Yetman
                                     Gregory Yetman
                                     Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 3/28/24                        *Nicholas Smith*
                                     Nicholas Smith
                                     Attorney for Defendant

**Exhibit D-2 page 70**